LEARNING CURVE INTERNATIONAL, INC., f/k/a Learning Curve Toys, L.P., *et al.*, Plaintiffs-Appellants, v. SEYFARTH SHAW LLP, *et al.*, Defendants-Appellees.

First District (4th Division) No. 1—08—0985

Opinion filed June 18, 2009.—Rehearing denied July 30, 2009.

Coleman Law Firm, of Chicago (Robert F. Coleman, Eugene J. Schiltz, Sean B. Crotty, and Elizabeth E. Richert, of counsel), for appellants.

Perkins Coie LLP, of Chicago (William T. Cahill, Bates McIntyre Larson, and Susan M. Lauer, of counsel), for appellees Seyfarth Shaw LLP, D'Ancona & Pflaum LLC, and Roger L. Price.

Swanson, Martin & Bell, LLP, of Chicago (Kevin T. Martin and Catherine Basque Weiler, of counsel), for appellees Dykema Gossett, PLLC, Rooks Pitts, and Dean A. Dickie.

JUSTICE STEELE delivered the opinion of the court:

Learning Curve International, Inc. (Learning Curve), merged with RC2 Brands, Inc. (RC2), while Learning Curve was involved in litigation against PlayWood Toys, Inc. (PlayWood). After Learning Curve

settled the PlayWood lawsuit, Learning Curve brought a lawsuit for malpractice against Roger L. Price and Dean A. Dickie, who had represented Learning Curve throughout most of the PlayWood litigation, and the firms for which Price and Dickie worked. The defendants in the legal malpractice action moved for summary judgment. They argued that Learning Curve had assigned its malpractice claim to its former shareholders in violation of Illinois law. Defendants also argued that the terms of the merger left Learning Curve with almost no damages due to the alleged malpractice, and that the statute of limitations barred the claim. The trial court granted summary judgment for defendants.

We hold that the assignment of the legal malpractice claim to Learning Curve's former shareholders, who suffered the loss due to the alleged malpractice, does not violate Illinois public policy. We also find that Learning Curve filed a timely complaint for legal malpractice. Further, we agree with the trial court that Learning Curve has not suffered most of the damages it seeks to recover and thus has a right to pursue only its claim for attorney fees incurred before the merger. We permit substitution of the former shareholders, the real parties in interest, as the plaintiffs for future litigation of the claim to recover the majority of the settlement amount and postmerger attorney fees.

## BACKGROUND

In May 1995, PlayWood sued Learning Curve in federal court for misappropriating a trade secret. *Learning Curve Toys, Inc. v. Play-Wood Toys, Inc.*, 342 F.3d 714, 720 (7th Cir. 2003). Learning Curve hired attorneys Dickie and Price, and the law firm of D'Ancona & Pflaum, to represent it in the PlayWood litigation. D'Ancona & Pflaum later merged into Seyfarth Shaw LLP. Dickie continued to represent Learning Curve after he joined Rooks Pitts, which later merged into Dykema Gossett, PLLC.

In April 1998, PlayWood's attorneys told Price that PlayWood would settle the lawsuit for $350,000. Learning Curve counteroffered $225,000. The parties did not settle the case.

In August 2000, a jury returned a verdict finding Learning Curve liable to PlayWood and awarding PlayWood royalties on sales of the product that used the alleged trade secret. An officer of Learning Curve estimated that the verdict would cost Learning Curve about $6 million. However, the trial court granted Learning Curve's posttrial motion for a judgment notwithstanding the verdict. The court held that PlayWood had not sufficiently proven that the information at issue qualified as a trade secret. The judgment left Learning Curve with no liability to PlayWood. PlayWood appealed to the United States Court of Appeals for the Seventh Circuit (Seventh Circuit).

Learning Curve's lawyers sent Learning Curve bills for their work on the trial. Richard Rothkopf, chair of Learning Curve, wrote to the attorneys:

"I anticipated that the trial would cost about $150,000 to $175,000. Instead, we are at a total to date of $350,000, and running. *** [W]e cannot pay these bills at these rates, and I am imploring you to review and reduce them appropriately."

In response, Price reduced the fees to less than $300,000. Rothkopf sought to negotiate further reductions.

While PlayWood's appeal remained pending before the Seventh Circuit, Learning Curve negotiated a merger with RC2. In the closing documents for the complex transaction, dated March 4, 2003, RC2 agreed to create a new subsidiary, RBVD Sub I, Inc., for the sole purpose of acquiring all shares of Learning Curve. RC2 agreed to pay $116,700,000 for Learning Curve, including almost $62 million for buying out all owners of Learning Curve's common stock. RC2 paid the shareholders over $40 million in cash and about $9 million in RC2 stock. RC2 put the remaining $12 million into an escrow account, used to secure RC2's right to indemnity for certain potential liabilities. Following the merger, Learning Curve continued as a corporation for tax purposes, but it had no separate operations and kept no separate financial accounts.

In the merger agreement, the shareholders of Learning Curve agreed to "defend, indemnify and hold harmless [RC2] and the Learning Curve Surviving Corporation *** from *** any Liability arising from or relating to any claims, charges *** or actions arising from, or in connection with, the Litigation." The agreement defined the "Litigation" to include "[c]laims, charges, demands, inquiries, investigations and actions relating to the facts in dispute in *Learning Curve Toys v. PlayWood Toys, Inc.*"

In August 2003, about five months after the corporations completed the merger, the Seventh Circuit issued its decision in *Learning Curve v. PlayWood*, 342 F.3d 714. The court reinstated the jury's verdict, making Learning Curve liable to PlayWood for about $6 million in compensatory damages, and remanded for a trial on exemplary damages. *Learning Curve v. PlayWood*, 342 F.3d at 731.

RC2 hired Sonnenschein Nath & Rosenthal to help it resolve the continued litigation with PlayWood. In December 2003, Learning Curve, wholly owned by RC2, agreed to pay PlayWood $11,162,500 to settle the trade secret lawsuit. RC2 claimed the remaining escrow amount as indemnity for its payment of the settlement. The former shareholders of Learning Curve, some of whom remained officers of Learning Curve after the merger, suggested suing Learning Curve's former legal counsel for malpractice.

RC2, Learning Curve, and Learning Curve's former shareholders modified the escrow agreement in December 2004. The parties said:

"(a) RC2 and Learning Curve shall use their respective reasonable commercial efforts to pursue the Malpractice Claim ***. RC2 and Learning Curve shall control the pursuit, compromise or settlement of the Malpractice Claim in consultation with the Shareholder Representatives ***. If the Shareholder Representatives do not believe that RC2 and Learning Curve are using their reasonable commercial efforts to pursue the Malpractice Claim to the satisfaction of the Shareholder Representatives, the Shareholder Representatives may *** elect to assume control of the pursuit, compromise or settlement of the Malpractice Claim ***.

(b) The parties have agreed that to the extent there is any recovery or payment received by RC2, Learning Curve or any of their Affiliates, successors or assigns with respect to the Malpractice Claim ***, RC2 and Learning Curve shall pay or cause to be paid to the [former shareholders] an amount equal to 90% of the Proceeds ***.

(c) RC2 agrees, in consultation with the Shareholder Representatives, to promptly make or cause to be made expenditures or incur costs including, without limitation, reasonable out-of-pocket costs, fees and expenses of attorneys *** in pursuit of the Malpractice Claim, which amounts *** shall be reimbursed [by the former shareholders] pursuant to the Escrow Agreement ***.

* * *

(g) Notwithstanding anything to the contrary set forth herein, nothing in this Letter Agreement shall be construed as either an assignment of the Malpractice Claim or an assignment of the proceeds of the Malpractice Claim."

An officer of Learning Curve clarified that 90% of the proceeds from the malpractice litigation would go to the former shareholders, and RC2 would take the remaining 10%.

Learning Curve and RC2 filed their malpractice complaint in February 2005, naming Dickie, Price, D'Ancona & Pflaum, Seyfarth Shaw, Rooks Pitts, and Dykema Gossett as defendants. The trial court granted a defense motion to dismiss RC2 as a plaintiff on grounds that none of the defendants had represented RC2 in the PlayWood litigation. Learning Curve claimed that defendants negligently advised Learning Curve to try the case rather than settle it for $350,000, and defendants negligently failed to advise Learning Curve that it faced a significant risk of incurring an adverse judgment of several million dollars, or that the court could find Learning Curve liable for exemplary damages. Learning Curve sought to recover the amount of

the settlement and all attorney fees paid after PlayWood's lawyers said they would settle the case for $350,000.

Defendants moved for summary judgment on the complaint, primarily arguing that Learning Curve had not suffered the damages alleged in the lawsuit. RC2 had paid PlayWood the entire amount of the settlement, and the former shareholders, through the escrow account, had reimbursed RC2 for the payment. RC2 also paid the attorneys for all work they performed on the PlayWood litigation after March 4, 2003, the date of the merger. The former shareholders reimbursed RC2 for those costs.

In response to the motion, Learning Curve produced its tax return for 2003, which showed that it took the full amount of the settlement as a deduction. The settlement agreement itself named Learning Curve as the party paying the agreed amount. Learning Curve also noted that before the merger, it had paid the defendants for their work on the litigation against PlayWood. Learning Curve had not been reimbursed for those payments.

Defendants added two further bases for their motion for summary judgment: Learning Curve's lawsuit was untimely, and Learning Curve had assigned its claim for legal malpractice to RC2 and the former shareholders.

The trial court granted summary judgment for defendants based on its finding that Learning Curve had assigned the claims for legal malpractice, which Illinois law precluded. The court also held that Learning Curve had no right to sue for the settlement amount or post-merger attorney fees, because Learning Curve had not paid those amounts. Learning Curve now appeals.

## DISCUSSION

We review the summary judgment *de novo*. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). Defendants advanced three bases for summary judgment: the alleged assignment, the statute of limitations, and the lack of damages. We address these three proposed bases for the judgment separately.

## I. Assignment

The trial court granted summary judgment for defendants based on its finding that Learning Curve assigned its malpractice claim in violation of Illinois law. An effective assignment "needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification." *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App. 3d 610, 616 (1987). The

"creation and existence of an assignment is to be determined according to the intention of the parties, and that intention is a question of fact to be derived not only from the instruments executed by them, but from the surrounding circumstances." *Rivan Die Mold Corp. v. Stewart Warner Corp.*, 26 Ill. App. 3d 637, 642 (1975).

Learning Curve asks us to reverse the summary judgment based upon the court's decision in *Brandon Apparel Group v. Kirkland & Ellis*, 382 Ill. App. 3d 273 (2008). In *Brandon Apparel*, the appellate court found the trial court needed to hear " 'evidence of extrinsic facts and circumstances' *** to determine the intent and agreement of the parties." *Brandon Apparel*, 382 Ill. App. 3d at 286, quoting *Rivan Die Mold Corp.*, 26 Ill. App. 3d at 642. However, Learning Curve does not cite or reference any further evidence it could present to show that it had not assigned its claim.

Under the modified escrow agreement, Learning Curve promised to pay 90% of the proceeds from the malpractice claim to its former shareholders, while RC2 would take the remaining 10%. Learning Curve and RC2, in consultation with the former shareholders, shared responsibility for pursuing the malpractice claim. RC2 and the former shareholders took full responsibility for paying any attorney fees incurred in pursuing the malpractice claim. RC2 and the former shareholders did not need to consult with Learning Curve concerning attorney fees and costs. According to the agreement, if the shareholder representatives believed Learning Curve and RC2 were not using reasonable efforts to protect the former shareholders' interests, the representatives could assume complete control over the claim.

Learning Curve effectively assigned 90% of the proceeds from the malpractice claim to its former shareholders. Unlike a dividend, the assigned proceeds go to the former shareholders of Learning Curve, not to its current shareholders. Also, Learning Curve ceded control over the lawsuit, as the former shareholders could, at their representatives' discretion, completely control the litigation.

Learning Curve emphasizes that the escrow modification expressly states, "nothing in this Letter Agreement shall be construed as either an assignment of the Malpractice Claim or an assignment of the proceeds of the Malpractice Claim." However, the clause does not change the effect of the prior provisions. We determine the character of a contract from its substantive effects, not from the labels that parties prefer to place on its provisions. *Maimon v. Telman*, 40 Ill. 2d 535, 538 (1968). Thus, we agree with the trial court that Learning Curve has assigned part of its claim to its former shareholders.

Illinois law generally forbids the assignment of claims for legal malpractice. *Brandon Apparel*, 382 Ill. App. 3d at 282. In *Clement v. Prestwich*, 114 Ill. App. 3d 479 (1983), the court explained:

"The confidence reposed in an attorney is of a personal nature and cannot be delegated by the attorney without the client's consent. [Citations.] A client's claim for malpractice arises from this personal relationship and is a claim that his attorney has breached a personal duty to the client ***. We believe that sound public policy prohibits the assignment of these claims since an assignee would be a stranger to the attorney-client relationship, who was owed no duty by the attorney and who suffered no injury from the attorney's actions.
***

*** [']The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing [sic] such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.' " *Clement*, 114 Ill. App. 3d at 480-81, quoting *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83, 87 (1976).

The rule in Illinois, as in other states, permits the transfer of a cause of action for legal malpractice under certain circumstances. For example, when a client dies after filing a claim for legal malpractice, the claim passes to the client's estate. *McGill v. Lazzaro*, 62 Ill. App. 3d 151, 154 (1978). If a bankruptcy estate owns a bankrupt person's claim for legal malpractice, then that estate has the power to assign that claim to the bankrupt person, giving that person the right to pursue the cause of action. *Hoth v. Stogsdill*, 210 Ill. App. 3d 659, 667 (1991).

Courts in other jurisdictions acknowledge the strong policy reasons for disallowing assignment of legal malpractice claims in most cases. See *New Hampshire Insurance Co. v. McCann*, 429 Mass. 202, 206-07, 707 N.E.2d 332, 335 (1999) (and cases cited therein). Nonetheless, several jurisdictions have carved out exceptions to the general rule prohibiting assignment of malpractice claims.

In *Cerberus Partners, L.P. v. Gadsby & Hannah*, 728 A.2d 1057 (R.I. 1999), Fleet Credit hired Gadsby & Hannah as counsel to assist with a loan to a corporation named SLM International, Inc. (SLM). Fleet Credit later sold its interest in the loan to Cerberus Partners. When SLM filed for bankruptcy, Cerberus Partners discovered that Gadsby & Hannah had failed to perfect Fleet's security interest in the loan. Cerberus Partners sued Gadsby & Hannah for legal malpractice. The trial court dismissed the suit based on public policy precluding assignment of legal malpractice claims. *Cerberus Partners*, 728 A.2d at 1059.

Rhode Island's Supreme Court explained its reasons for reversing the judgment:

> "The legal malpractice claim asserted by the plaintiffs here arose out of a larger earlier commercial loan transaction. The plaintiffs did not merely purchase the legal malpractice claim, but were instead the assignees of the Lenders' original agreements with respect to the loans to SLM, and the plaintiffs acquired, along with those loans, all of the attendant obligations and rights that went along with those loans, including but not limited to the Lenders' legal malpractice action against the defendants. Thus, we are not dealing here with a situation where a legal malpractice claim was transferred to a person without any other rights or obligations being transferred along with it. ***
>
> * * *
>
> *** [F]reestanding malpractice personal injury claim assignments *** necessarily involve and invoke the unique lawyer-client relationship and duty of confidentiality; privity, and the duty of the lawyer that runs only to the client; the creation of possible commercial markets for such claims; and the demeaning of the legal profession along with the prospect of having attorneys defend themselves against strangers and the possibility of being forced to divulge confidential lawyer-client information in defending against assigned claims. ***

We are persuaded of the soundness of the reasoning employed by those courts in jurisdictions that have distinguished between the voluntary assignment of a bare legal claim for malpractice and the assignment of a claim for malpractice that is part of a general as-

signment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations." *Cerberus Partners*, 728 A.2d at 1059-60.

In *Richter v. Analex Corp.*, 940 F. Supp. 353 (D.D.C. 1996), Analex purchased assets from Xanalex and assumed Xanalex's liability for payment of several fines imposed on Xanalex. Analex then sued Richter for legal malpractice, claiming that Richter's misconduct as Xanalex's counsel led to the fines. The court held:

"[P]laintiff was the attorney for the predecessor corporation whose liabilities now burden defendant. The legal malpractice claim was not bartered or sold to an unrelated third party; indeed, Analex argues that its liabilities, assumed from Xanalex, arose directly out of plaintiff's conduct. Moreover, the interests involved are purely pecuniary in nature and do not implicate the kinds of concerns raised by the sale or assignment of a personal injury claim. ***

This Court concludes that in circumstances such as these, public policy does not prohibit the assignment of a legal malpractice claim." *Richter*, 940 F. Supp. at 358.

■ Illinois courts have not addressed assignment of a legal malpractice claim as part of a transfer of assets in a merger. Here, as in *Richter* and *Cerberus Partners*, the assignment formed a minor part of a transaction that encompassed a panoply of other rights and obligations. Learning Curve did not assign the claim to an unrelated third party; instead, Learning Curve assigned part of the claim to the persons who actually suffered the loss due to the alleged malpractice. We find that public policy does not prohibit the assignment of the malpractice claim under these specific circumstances. Hence, the rule barring the assignment of Learning Curve's claim is not applicable; therefore, the defendants were not entitled to judgment as a matter of law.

## II. Statute of Limitations

■ Defendants argue that the two-year statute of limitations (735 ILCS 5/13—214.3 (West 2000)) gives this court an independent basis for affirming summary judgment in their favor. The statute requires the plaintiff in a legal malpractice cause of action to file a complaint "within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13—214.3 (West 2000). Learning Curve alleges that defendants failed to advise Learning Curve that Learning Curve faced a significant risk of incurring a judgment that would render it liable for millions of dollars in damages. Defendants also advised Learning Curve that attorney fees for winning at trial would cost less than

payment of the proposed settlement amount of $350,000. According to a letter Rothkopf wrote after trial, trial fees exceeded $350,000, and Learning Curve still had to pay fees for defending the appeal. Defendants contend that the high fees they billed Learning Curve constituted known damages due to inaccurate advice about the lawsuit.

The appellate court outlined principles applicable to a determination of whether the statute of limitations has expired for a legal malpractice claim in *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 355-56 (1998):

> "[T]he incurring of additional attorney fees may trigger the running of the statute of limitations for legal malpractice purposes, but only where it is clear, at the time the additional fees are incurred, that the fees are directly attributable to former counsel's neglect. ***
>
> * * *
>
> *** [A] cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney."

In *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 372 (2007), the court explained that the cause of action could accrue prior to an adverse judgment in "rare cases in which it is painfully obvious, prior to any adverse ruling against the plaintiff client, that he has been injured as the result of professional negligence."

We apply the general rule to the facts in this case. The adverse verdict alerted Learning Curve that its potential liability exceeded the worst case scenario its attorneys had envisioned. However, the trial court did not enter judgment on the verdict. Instead, the court entered judgment in favor of Learning Curve. Learning Curve then remained liable only to its attorneys for their fees. While their fees exceeded anticipated fees, Learning Curve negotiated a reduction which left Learning Curve with no actionable damages even if defendants had committed malpractice. We cannot say that the malpractice and its consequential damages became "painfully obvious" prior to the Seventh Circuit's decision reversing the trial court's judgment. Because Learning Curve filed suit less than two years after the Seventh Circuit's ruling in PlayWood's favor, the statute of limitations had not expired and does not mandate judgment in favor of defendants.

## III. Damages

■ Finally, the trial court granted partial summary judgment in favor of defendants based on the court's finding that Learning Curve did not sustain any damages from payment of the settlement and at-

torney fees incurred after the merger. RC2 paid those amounts and obtained reimbursement from the escrow account. Learning Curve's former shareholders would have received 90% of the escrow account if RC2 had not claimed the escrow to reimburse it for the settlement and attorney fees. Thus, Learning Curve's former shareholders incurred 90% of the loss from the alleged malpractice, and RC2 suffered the loss of the remaining 10%.

To prevail on a claim for legal malpractice, a plaintiff must show that the alleged malpractice caused it actual damages. *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 62-63 (2002). "The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence. *** The plaintiff can be in no better position by bringing suit against the attorney than if the underlying action had been successfully prosecuted or defended." *Sterling Radio*, 328 Ill. App. 3d at 64.

Here, Learning Curve had no net loss due to RC2's payment of the settlement and the reimbursement from the escrow account. Learning Curve also lost nothing when RC2 paid defendants' attorney fees after the merger. RC2's reimbursement from the escrow for those fees did not affect Learning Curve's assets. Because the indemnity provisions in the merger agreement eliminate Learning Curve's loss due to the settlement and payment of postmerger attorney fees, the trial court correctly found that Learning Curve could not recover those amounts as its damages.

However, Learning Curve assigned its claim against defendants to the parties who actually suffered most of the loss, the former shareholders of Learning Curve. "Supreme Court Rule 366 grants a reviewing court the discretionary power to substitute or rearrange parties by reason of assignment, and we note that we are to do so on such terms as we deem just." *Midwest Bank & Trust Co. v. Roderick*, 132 Ill. App. 3d 463, 466 (1985). In the present procedural posture of the case, we must not assess the merits of the legal malpractice claim. But if the defendants committed malpractice, the merger of the corporate client should not cause the claim to vanish. Under Rule 366(a)(2) (155 Ill. 2d R. 366(a)(2)), we permit the former shareholders of Learning Curve to substitute as the real parties in interest for the legal malpractice claim, insofar as the shareholders seek to recover the cost of the settlement and postmerger attorney fees.

## CONCLUSION

Under the particular circumstances of this case, we find that Illinois public policy does not preclude Learning Curve from assigning its cause of action for legal malpractice to its former shareholders, the

owners of Learning Curve at the time of the alleged malpractice, who allegedly received substantially less from the sale of their shares than they would have received if not for the alleged malpractice. Learning Curve and its shareholders did not discover that they had suffered any damage due to the alleged malpractice until the Seventh Circuit reversed the judgment entered in Learning Curve's favor. Therefore, the statute of limitations does not bar the suit. In the merger that took place pending the appeal in the PlayWood litigation, Learning Curve's former shareholders agreed to indemnify Learning Curve and RC2 for settling the PlayWood litigation and for attorney fees incurred therein, after the merger. The indemnity provision effectively protected Learning Curve from suffering any damages due to the alleged malpractice insofar as the malpractice caused Learning Curve to owe postmerger attorney fees and an excessive settlement. We permit Learning Curve's former shareholders to substitute as plaintiffs for litigating that part of the malpractice claim on remand. Nonetheless, Learning Curve retains a sufficient interest to pursue its malpractice claim for attorney fees paid before the merger.

Reversed and remanded.

GALLAGHER and NEVILLE, JJ., concur.