## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 52007

ACORN INVESTMENTS, LLC, )
an Idaho limited liability company, )
as successor in interest to LEWIS )
PATRICK and MICHELLE )
SIVERTSON, and the marital )
community composed thereof; AHR, ) **Coeur d'Alene, September 2025 Term**
LLC, an Arizona limited liability )
Company; FETCHINGLY GOOD, ) **Opinion Filed: November 19, 2025**
LLC, an Idaho limited liability company, )
) **Melanie Gagnepain, Clerk**
    Plaintiff-Appellant, )
)
v. )
)
FORD ELSAESSER and ELSAESSER )
ANDERSON, CHTD, an Idaho )
professional service corporation, )
)
    Defendants-Respondents. )
_____)

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Susie Jensen, District Judge.

The judgment of the district court is <u>affirmed</u>.

Witherspoon Brajcich McPhee, PLLC, Coeur d'Alene, attorneys for Appellant. Mark A. Ellingsen argued.

Benoit, Mollerup, Danielson & Grieve, PLLC, Twin Falls, attorneys for Respondents. Bren Mollerup argued.

_____

BEVAN, Chief Justice.

This appeal concerns the assignability of a legal malpractice claim. Acorn Investments, LLC (Acorn) appeals from the district court's judgment dismissing its legal malpractice lawsuit against Ford Elsaesser and Elsaesser Anderson, Chtd. (Elsaesser). Elsaesser represented Lewis Patrick, Michele Sivertson, AHR, LLC, and Fetchingly Good, LLC (the Original Plaintiffs) in earlier litigation brought against them by Acorn. Stemming from that representation, the Original

1

Plaintiffs filed a legal malpractice claim against Elsaesser, which was later assigned to Acorn. The district court granted summary judgment against Acorn, concluding that the Original Plaintiffs' malpractice claim was not assignable to Acorn. Acorn challenges the district court's ruling, arguing that, under *St. Luke's Magic Valley Regional Medical Center v. Luciani*, 154 Idaho 37, 293 P.3d 661 (2013), and public policy considerations, the legal malpractice claim was assignable because it was transferred to Acorn in a commercial transaction, along with other business assets. For the reasons below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a dispute concerning the transfer of assets formerly held by Laughing Dog Brewing, Inc. (LDB), and the subsequent inability of its creditors—most notably Acorn—to recover on a judgment against LDB. LDB was owned and managed by Lewis Patrick and Michele Sivertson. In 2017, facing financial difficulties, LDB sought to secure further investment from AHR, LLC, an entity likewise managed by Patrick and Sivertson. To that end, attorney J. Ford Elsaesser, of the firm Elsaesser & Anderson, simultaneously represented LDB, AHR, and Fetchingly Good, LLC—yet another affiliated entity—and proposed a plan to restructure the companies' debt obligations.

As part of the plan, Elsaesser drafted a $1.3 million promissory note from LDB to AHR, secured by LDB's assets. Thereafter Fetchingly Good, LLC purchased LDB's outstanding loan from Columbia Bank. Allegedly acting on Elsaesser's advice, AHR and Fetchingly Good accepted LDB's assets in satisfaction of the secured obligations, thereby avoiding a public foreclosure sale. LDB's board, comprised of Patrick, Sivertson, and one other director, approved the transfer. Elsaesser allegedly did not inform his clients of any potential conflicts of interest regarding his representation, nor did he advise them of the legal risks arising from the overlapping interests.

After the asset transfer, which included its assets, accounts, and business operations, Fetchingly Good assumed LDB's operations. LDB subsequently filed for Chapter 7 bankruptcy, as purportedly recommended by Elsaesser. Acorn, which had previously obtained a judgment against LDB, initiated a case against the Original Plaintiffs, asserting claims under the Idaho Uniform Voidable Transactions Act (UVTA), I.C. § 55-910, the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, the Idaho Racketeering Act, I.C. § 18-7803, and various successor liability theories.

2

Elsaesser undertook the defense of all named defendants (the Original Plaintiffs), offering his services at no cost. During the litigation, Elsaesser allegedly failed to respond to discovery requests, disregarded court orders, and ultimately exposed his clients to sanctions. The Original Plaintiffs eventually retained new counsel and filed a lawsuit against Elsaesser, which asserted three causes of action: legal malpractice, breach of contract, and breach of fiduciary duty (the "legal malpractice case"). Acorn's case against the Original Plaintiffs then resolved pursuant to a stipulated judgment, settlement agreement, and covenant not to execute (Settlement Agreement).

Under the terms of the Settlement Agreement, LDB, AHR, and Fetchingly Good stipulated to judgment in favor of Acorn in the amount of $910,617.16. However, Acorn agreed not to execute on the judgment and instead accepted an assignment of LDB's, AHR's, and Fetchingly Good's claims against Elsaesser and his firm, including those raised in the legal malpractice case. Acorn further agreed to dismiss its claims against the Original Plaintiffs with prejudice.

The Settlement Agreement contained the following language:

> Defendants hereby assign to the Plaintiff all of their rights, including rights under any tolling agreements, causes of actions and claims, including claims for legal malpractice, breach of contract, breach of fiduciary duty, negligence, unjust enrichment, contribution, indemnity, against Elsaesser and Firm, related to the claims for damages suffered by the Plaintiff as detailed in the underlying complaint. This assignment would include, but not necessarily be limited to, those claims raised in the complaint attached as Exhibit A and claims for attorney's fees and costs that Defendants have incurred in the defense of Plaintiff's claims. This assignment of claims against Elsaesser and Firm is intended to be given the broadest construction possible, with any ambiguity or question resolved in favor of assignment of claims against Elsaesser and Firm from Defendants to Plaintiff.

Thereafter, Acorn and the Original Plaintiffs filed a stipulated motion for Acorn Investments, LLC, to substitute as the plaintiff in the legal malpractice case. After briefing and oral argument, and over Elsaesser's objection, the district court granted the motion to substitute. Elsaesser then filed a motion for reconsideration or, alternatively, for summary judgment, arguing that the Original Plaintiffs could not assign their legal malpractice claims to Acorn. The district court denied reconsideration but granted summary judgment in favor of Elsaesser, concluding that the legal malpractice case was not assignable to Acorn. The court subsequently entered an amended judgment dismissing the case without prejudice. Acorn appealed.

## II.    ISSUES ON APPEAL

1.    Whether the district court erred in granting Elsaesser's motion for summary judgment.

3

**2.**     Whether either party is entitled to attorney fees and costs on appeal.

### III.     STANDARD OF REVIEW

"[T]he standard of review for this Court when reviewing a district court's grant of summary judgment is well-settled: this Court 'uses the same standard properly employed by the district court originally ruling on the motion.'" *Rich v. Hepworth Holzer, LLP*, 172 Idaho 696, 702, 535 P.3d 1069, 1075 (2023) (quoting *Ciccarello v. Davies*, 166 Idaho 153, 158, 456 P.3d 519, 524 (2019)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Ciccarello*, 166 Idaho at 158–59, 456 P.3d at 524–25 (citing I.R.C.P. 56 (a)). "All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party." *Id.* at 159, 456 P.3d at 525 (internal citation omitted). "In order to survive a motion for summary judgment, the non-moving party must 'make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Jones v. Starnes*, 150 Idaho 257, 259–60, 245 P.3d 1009, 1011–12 (2011)). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hollingsworth v. Thompson*, 168 Idaho 13, 17, 478 P.3d 312, 316 (2020) (internal citation omitted).

### IV.     ANALYSIS

**A.     We affirm the district court's decision granting summary judgment to Elsaesser.**

The sole issue on appeal is whether the legal malpractice claim asserted against Elsaesser can be assigned. The Court answered this question in *St. Luke's Magic Valley Regional Medical Center v. Luciani*, 154 Idaho 37, 293 P.3d 661 (2013). "[W]hile legal malpractice claims are generally not assignable, where the legal malpractice claim is transferred to an assignee in a commercial transaction, along with other business assets and liabilities, such a claim is assignable." *Id*. at 43, 293 P.3d at 667; *see* 6 AM. JUR.2d *Assignments* § 57 ("Legal malpractice claims, transferred along with other assets and obligations to an assignee in a commercial transaction, may be assignable."). The dispute here centers on whether the underlying legal malpractice claim between Original Plaintiffs and Elsaesser falls within the confines of the *Luciani* exception. For the reasons we discuss below, we hold that it does not.

4

In *Luciani*, Thomas Luciani and his law firm defended Magic Valley Regional Medical Center (MVRMC) against wrongful termination claims and False Claims Act claims by former hospital employees. 154 Idaho at 38, 293 P.3d at 662. Anticipating a deadline to respond to an unfavorable witness report, MVRMC terminated Luciani, and hired a new law firm. *Id.* at 39, 293 P.3d at 663. Around the same time, MVRMC, previously owned by Twin Falls County, was transferred to St. Luke's Health System through a comprehensive sale and lease agreement that included the transfer of assets and liabilities, including obligations related to the ongoing litigation in which Luciani had represented MVRMC. *Id.* at 39, 293 P.3d at 663. After the sale closed, St. Luke's ultimately settled with the former employees. *Id.* Subsequently, St. Luke's sued Luciani and his firm for legal malpractice in federal court, but the malpractice claim was not specifically assigned in the sale and lease agreement. *Id.* Because whether a legal malpractice claim could be assigned was a novel legal question in 2013, the federal district court certified the question to the Idaho Supreme Court. *Id.*

In answer to the question, this Court held that "where a legal malpractice claim is transferred to an assignee in a commercial transaction, along with other business assets and liabilities, such a claim is assignable." *Id.* at 41, 293 P.3d at 665. In reaching that answer, we acknowledged the general rule that "an attorney will be held liable for negligence only to his or her client and not to someone with whom the attorney does not have an attorney-client relationship." *Id.* (quoting *Harrigfeld v. Hancock*, 140 Idaho 134, 137, 90 P.3d 884, 887 (2024)). But the Court, on review of other jurisdictions, recognized that an exception exists for the assignability of legal malpractice claims so long as such claims are "transferred to an assignee in a commercial transaction" with other assets and liabilities. *Id.* at 43, 293 P.3d at 667.

In reaching its decision, the *Luciani* Court relied on several cases, including *Cerberus Partners, L.P. v. Gadsby & Hannah,* 728 A.2d 1057, 1058 (R.I. 1999). There, a group of financial institutions purchased from a group of lenders loans that were made to a debtor that later went into bankruptcy. *Id.* at 1058. The financial institutions alleged that the attorneys for the lenders failed to perfect the security interests for the loans. *Id.* at 1058–59. Because the security interests were not perfected, the financial institutions could not obtain the full value of the loans; instead, the financial institutions had to settle for a lesser amount. *Id.* at 1058. In subsequent litigation, the financial institutions argued that it was negligence on the part of the lenders' attorneys that caused

5

their security interests not to be perfected, and that, as successors in interest to the lenders, they should be able to assert a claim for legal malpractice and negligence. *Id.*

On appeal, the Supreme Court of Rhode Island concluded that "legal malpractice claims, transferred along with other assets and obligations to an assignee in a commercial transaction, are assignable." *Id.* at 1061. The court reasoned that:

> The legal malpractice claim asserted by the plaintiffs here arose out of a larger earlier commercial loan transaction. The plaintiffs did not merely purchase the legal malpractice claim, but were instead the assignees of the Lenders' original agreements with respect to the loans to [the bankrupt debtor], and the plaintiffs acquired, along with those loans, all of the attendant obligations and rights that went along with those loans, including but not limited to the Lenders' legal malpractice action against the defendants.

*Id.* at 1059.

In reaching its conclusion, the Supreme Court of Rhode Island was careful to distinguish the "voluntary assignment of a bare legal claim for malpractice" from the "assignment of a claim for malpractice that is part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations." *Id.* at 1060. That holding, as relied on by this Court in *Luciani*, is consistent with how other jurisdictions have analyzed the assignment of legal malpractice claims. *See, e.g.*, *Richter v. Analex Corp.,* 940 F. Supp. 353, 357 (D.D.C. 1996) (assignment of legal malpractice claim was valid because plaintiff had purchased assets and liabilities from an entity, and because "[t]he courts that have barred the assignment of legal malpractice claims have relied primarily on factors not present in this case, including the fear that parties will sell off claims, particularly to opponents or completely unrelated third parties, and a concern about jeopardizing the personal nature of legal services"); *Learning Curve Intern., Inc. v. Seyfarth Shaw, LLP*, 911 N.E.2d 1073 (2009); *Thurston v. Cont'l Cas. Co.*, 567 A.2d 922, 923 (Me. 1989) ("[T]here is no reason to prohibit the assignment of a legal malpractice claim [where the] assignee has an intimate connection with the underlying lawsuit."); *but see Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak,* 539 A.2d 357, 359 (Pa.1988) (assignment of "all rights and causes of action" against attorneys relating to mishandling of patent application held valid because the court refused to "allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice").

As it pertains to the assignment here, Elsaesser maintains that the terms of the Settlement Agreement are "not what the *Luciani* Court had in mind" when it carved out an exception to the

non-assignability of malpractice claims. The district court agreed, reasoning that the specific facts underlying the assignment of claims against Elsaesser fell outside the narrow exception that the *Luciani* Court clarified:

> To the extent that the Settlement Agreement was a commercial transaction, the only transfer was assignment of claims against Defendants. Original Plaintiffs did not transfer any other business assets or liabilities, or any business obligations, to Acorn. The possibility of executing a monetary judgment against the Original Plaintiffs in the future, against assets that may be held at that time, does not parallel or correspond to the assets, liabilities, and obligations considered by the *St. Luke's* Court. This was an "isolated purchase" and was not "one component of a sale that transferred the bulk" of AHR, Fetchingly Good, and LDB's assets and liabilities to Acorn. Acorn did not purchase or acquire AHR, Fetchingly Good, and LDB. Acorn did not take over or merge with AHR, Fetchingly Good, and LDB. Acorn did not take over any buildings, properties, businesses, operations, contracts, or ongoing obligations. AHR and Fetchingly Good are still separate, active entities and Fetchingly Good continues to operate LDB's main asset – Laughing Dog Brewing. . . . The facts in this case are clearly differentiated from those in *St. Luke's* and Acorn should not be treated as a successor to the Original Plaintiffs when assessing the propriety of the assignment.

The district court's reasoning is sound. Implicit in *Luciani* is the requirement that the legal malpractice claim be transferred to an assignee as part of a larger *commercial transaction*. The assignment here was not part of a commercial transaction involving the purchase of another entity's assets and liabilities; it was part of a settlement of an independent lawsuit.

Though the legal malpractice claim itself may have stemmed from a "commercial transaction," the assignment does not transfer any rights or interests in the underlying business dealings among AHR, Fetchingly Good, LDB, and Acorn, such as the promissory note, security agreement, or foreclosure-related transactions, nor does it assign control over the corporate entities involved. Under *Luciani*, the legal malpractice claim can be assigned when the purchaser also assumes responsibilities for the business-related liabilities that result from the alleged legal malpractice. That did not happen here; there was no assignment of business assets and liabilities in exchange for the legal malpractice claim. Indeed, the Assignment only purports to transfer

> rights under any tolling agreements, causes of actions and claims, including claims for legal malpractice, breach of contract, breach of fiduciary duty, negligence, unjust enrichment, contribution, indemnity, against Elsaesser and Firm, related to the claims for the damages suffered by the Plaintiff as detailed in the underlying complaint.

7

This limited scope provides that Acorn steps into the shoes of the Original Plaintiffs *solely* for purposes of pursuing recovery against Elsaesser, rather than taking ownership of the disputed commercial transactions themselves or including a transfer of other business assets and liabilities. Thus, the Settlement Agreement merely transferred, through a single paragraph, the assignment of rights stemming from causes of action and claims that may exist against Elsaesser. The remainder of the settlement agreement included a stipulation to the entry of judgment against the Original Plaintiffs along with a covenant not to execute. While the causes of action asserted against Elsaesser, including the legal malpractice claim, may properly be included in an assignment *along with* business assets and liabilities under the exception carved out in *Luciani*, assignment of the legal malpractice claims alone are not enough to fall within the exception.

Acorn argues that "in executing the Settlement Agreement, AHR effectively allowed the transfer of equity interest AHR had in the property and building pursuant to the judgment and its respective judgment lien interest to Acorn." Acorn also maintains that "in executing the Settlement Agreement and consenting to the entry of a monetary judgment against them, both Fetchingly Good and AHR also gave permission to Acorn to execute against any other assets of AHR and Fetchingly Good pursuant to a writ of execution on the underlying judgment subject to the terms and conditions of the forbearance agreement contained therein."

This argument is unsupported by the record and, more notably, unsupported by the plain language of the Settlement Agreement. First, within the broader terms of the Settlement Agreement, Acorn agreed that it would "not execute upon or attempt to enforce this or any judgment or related claim against Defendants," and agreed "[i]nstead . . . to pursue its claims against others based upon the assignment evidenced in this Agreement or otherwise." Second, Acorn agreed to "execute and file a full satisfaction of judgment in favor of Defendants as soon as the claim underlying this lawsuit [against Elsaesser] or the assigned claims have concluded[.]"

Acorn's contention that the Settlement Agreement allowed the transfer of the "equity interest AHR had in the property and building pursuant to the judgment and its respective judgment lien interest to Acorn" is unsupported by the Agreement's language. As discussed, the only assignment under the Agreement was the assignment of claims against Elsaesser, including the legal malpractice claim.

Acorn relies on several public policy arguments to bolster its contention that the legal malpractice claim against Elsaesser is assignable. First, Acorn points to a portion of the *Luciani*

Court's opinion, which recognized that permitting the assignment would prevent Luciani from "'entirely escap[ing] liability' for any alleged malpractice":

> Magic Valley no longer exists to enforce this malpractice claim and, without a valid assignment, neither could any other entity enforce it. St. Luke's points out that the mere 'fortuity' of this change in corporate ownership would mean that Luciani could 'entirely escape liability' for any alleged malpractice. And in an era of ever-increasing corporate restructuring, it is hard to imagine that this Court, bestowing such a lucky break to attorneys, while leaving clients without recourse, would lead to any public perception except favoritism. In other words, forbidding assignment here would likely lead to the 'very real concern' identified by Justice Horton in his dissent in *Bishop*—that a 'decision of this Court will reinforce the perception, shared by many in our society, that courts will go out of their way in order to protect members of the bar.' *Bishop*, 152 Idaho at 626, 272 P.3d at 1257. We therefore, find that there are no public policy concerns disfavoring the assignment of a legal malpractice claim in the context of this case.

*St. Luke's Magic Valley Reg'l Med. Ctr. v. Luciani*, 154 Idaho 37, 44, 293 P.3d 661, 668 (2013).

While we acknowledge the validity of this rationale, the same public policy concern is not applicable here. Unlike *Luciani*, in which Magic Valley no longer existed, AHR and Fetchingly Good are still existing entities. AHR and Fetchingly Good subsumed LDB; no one has suggested that these entities cannot pursue the legal malpractice litigation. In fact, the Original Plaintiffs sued Elsaesser, and those parties, other than LDB can continue to pursue these claims against Elsaesser.[1]

In the same public policy vein, Acorn also advocates for extending the *Luciani* exception as an additional "liability deterrent" for attorneys who violate the Idaho Rules of Professional Conduct as a litigation tactic. Acorn argues Elsaesser was representing LDB during Acorn's collection efforts against LDB. Acorn maintains that, despite the ethical restrictions against joint representation contained in Idaho Rule of Professional Conduct 1.7, Elsaesser represented LDB, AHR, and Fetchingly Good to institute a plan that would prevent Acorn from executing on LDB's assets. Put simply, Acorn advocates for this Court to expand *Luciani* to permit the assignment of a legal malpractice claim "in unique cases like this where a lawyer elects to engage in litigation tactics which violate the Idaho Rules of Professional Conduct[.]" While we make no determination as to whether Elsaesser violated Rule 1.7, using that alleged misconduct as rationale for assigning a legal malpractice claim would be an improper extension of *Luciani*.

---

[1] We acknowledge that counsel for Original Plaintiffs conceded during oral argument that his clients do not have the funds to pursue Elsaesser. That said, the financial inability of the parties to pursue a legal malpractice claim is not a policy rationale for extending the *Luciani* exception.

In *Luciani*, we were reticent to permit assignment of legal malpractice claims at all, recognizing that the general rule prohibits such an assignment. In crafting an exception to that general rule, we examined how other states have addressed the issue. *See Luciani*, 154 Idaho at 43, 293 P.3d at 667. Expanding the exception to any violation of the Rules of Professional Conduct would swallow the exception, as ostensibly, any legal malpractice claim will include allegations that the attorney violated the Rules of Professional Conduct. Instead, the proper procedure for asserting that Elsaesser violated the Rules of Professional Conduct is a complaint with the Idaho State Bar. Under the Idaho Bar Commission Rules established by this Court, Rules 505 and 506 outline the grounds for available sanctions. *See* I.B.C.R. 505, 506. Violating ethical rules, without more, is not a sufficient ground to assign a claim for legal malpractice.

In short, we are not persuaded by Acorn's public policy arguments. The exception under *Luciani* is a narrow one and we decline to extend it here. Accordingly, the district court's grant of summary judgment to Elsaesser is affirmed.

**B.    Neither party is entitled to attorney fees on appeal. Elsaesser is awarded costs.**

Both parties make conclusory arguments for attorney fees. Acorn requests attorney fees under Idaho Code section 12-120(3), alleging that "the underlying lawsuit and this appeal constitute a commercial transaction[.]" Elsaesser requests "costs and fees on appeal pursuant to Rules 35(b)(5), 40, and 41 of the Idaho Appellate Rules."

"A party seeking attorney fees on appeal must state the basis for such an award." *Bracken v. City of Ketchum*, 172 Idaho 803, 824, 537 P.3d 44, 65 (2023) (quoting *Jones v. Lynn*, 169 Idaho 545, 565, 498 P.3d 1174, 1194 (2021)). "This means that the party seeking fees must provide argument on the issue and not simply cite a statute." *Id.* (citing I.A.R. 35(a)(6), (b)(6)). "[A]bsent any legal analysis or argument, 'the mere reference to [a] request for attorney fees is not adequate.'" *Jones*, 169 Idaho at 565, 498 P.3d at 1194 (quoting *Johnson v. Murphy*, 167 Idaho 167, 176, 468 P.3d 297, 306 (2020) (second alteration in original)).

Acorn has not prevailed and is not entitled to an award of attorney fees. Although Elsaesser is the prevailing party on appeal, we decline to award attorney fees given the deficiency in Elsaesser's request. Elsaesser is entitled to costs.

## V.    CONCLUSION

The district court's judgment is affirmed.

JUSTICES BRODY, MOELLER, ZAHN, and MEYER CONCUR.