# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165

---

| | |
|---|---|
| Appellate Court Caption | BLUE WATER PARTNERS, INC., and FANE LOZMAN, Plaintiffs-Appellants, v. EDWIN D. MASON, FOLEY AND LARDNER, a General Partnership, and FOLEY AND LARDNER, LLP, a Limited Liability Partnership as Successor to Foley and Lardner, a General Partnership, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2165 |
| Filed | July 13, 2012 |
| Rehearing denied | August 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendants on the legal malpractice claim filed by plaintiff corporation and one of the corporation's officers, since no attorney-client relationship existed between defendants and the officer, the officer was not an intended third-party beneficiary of the attorney-client relationship between defendants and the corporation, and the corporation's claim was barred by *laches*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-9280; the Hon. Thomas Hogan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Philip J. Nathanson, of Nathanson Law Firm, and Barry D. Goldberg, of Goldberg & Goldberg, both of Chicago, for appellants.

William T. Cahill and Jade R. Lambert, both of Perkins Coie, LLP, of Chicago, for appellees.

Panel

JUSTICE GARCIA delivered the judgment of the court, with opinion.
Justice Lampkin specially concurred, with opinion.
Presiding Justice Gordon dissented, with opinion.

## OPINION

¶ 1    This appeal is related to an appeal by plaintiffs Blue Water Partners, Inc. (BWP), and Fane Lozman in an earlier lawsuit against Gerald Putnam and other individuals and entities, which we decided in *Lozman v. Putnam*, 379 Ill. App. 3d 807 (2008) (the Putnam suit). This appeal concerns the plaintiffs' professional negligence claims against defendants Foley & Lardner[1] and Edwin D. Mason, a partner with the law firm (the Putnam attorneys), as counsel for BWP, grounded on the same events that were the basis of the Putnam suit. The attorney-client relationship between BWP and its former counsel ended in 1995. The Putnam attorneys were not named as defendants in the Putnam suit, which ended in a judgment in favor of Putnam in 2005 that we affirmed. In this appeal, the circuit court ruled Fane Lozman, as a BWP shareholder, had no standing to sue the Putnam attorneys for legal malpractice as no attorney-client relationship ever existed between the Putnam attorneys and Lozman. The court also ruled that BWP's lawsuit against the Putnam attorneys, filed in 2006, was barred by the two-year statute of limitations. Both plaintiffs challenge the lawsuit's dismissal. The plaintiffs contend their malpractice suit against defendant attorneys did not accrue until the verdict issued on July 25, 2005, in the Putnam suit, which was filed in 1999. The circuit court rejected this contention. We do as well and affirm.

¶ 2                    BACKGROUND

¶ 3    We detailed the relationship between Putnam and Lozman, including how they met, and their eventual fallout, in our 2008 decision. *Lozman*, 379 Ill. App. 3d 807. In that case, the circuit court ruled the plaintiffs' equitable claim of usurpation of corporate opportunities was barred by both the doctrine of *laches* and an October 1995 release executed by the parties. *Id.* at 809. We affirmed on the basis of *laches*. *Id.* at 821. We add to the facts set out in our

---

[1]Foley & Lardner, LLP, is the successor to Foley & Lardner, a general partnership.

2008 decision those additional facts that are germane to the issues before us.

¶ 4       On March 28, 1994, Putnam formed BWP with the legal assistance of the defendants. Putnam advised the defendants that he was severing his relationship with his then employer and desired to broker trades for his customers through a new company, BWP. Shortly after BWP's incorporation, the defendants applied for an employer identification number with the Internal Revenue Service (IRS) in which they listed BWP's principal business activity as "broker-dealer services." In May 1994, Putnam and Lozman decided to implement a computer software product called ScanShift, invented by Lozman, into the business activity of BWP. Their plan was to operate BWP as a "soft dollar" brokerage firm, which we understand to mean that BWP would earn commissions based on its customers' use of ScanShift in conducting trades.

¶ 5       On August 2, 1994, Putnam and Lozman met with Mason to discuss the business plan to develop ScanShift through BWP. Putnam was the principal contact for BWP in interacting with the defendant attorneys. In fact, defendant Mason communicated with Lozman only once or twice during the time the defendant attorneys represented BWP. According to Mason's deposition testimony, he relied on Putnam to keep Lozman abreast of their communications.

¶ 6       In the fall of 1994, Putnam and Mason discussed whether the Securities and Exchange Commission (SEC) would allow BWP to receive "soft dollar" revenue from trades conducted through ScanShift without registering BWP with the SEC as a broker-dealer. In early 1995, Mason advised Putnam that whether BWP was required to register with the SEC to lawfully receive soft dollar revenue from trades conducted through ScanShift was "unsettled." Mason indicated that BWP might have to be a "test" case to resolve the question. An application to register BWP as a broker-dealer with the SEC was never filed.

¶ 7       In November 1994, Putnam informed the defendant attorneys that he terminated his employment with BWP and decided to go into business for himself to trade for his institutional clients. At Putnam's direction, defendant Mason incorporated Terra Nova Trading, LLC (Terra Nova), wholly owned by Putnam, and another Putnam-owned company, GDP, Inc., on November 14, 1994. Lozman testified that he was aware of the formation of Terra Nova from the outset. Lozman's knowledge included that Terra Nova was established to be an SEC-registered, active trading broker-dealer. Lozman testified that Terra Nova was created to allay the fears of Stuart and Marrgwen Townsend, who operated Townsend Analytics (all defendants in the Putnam suit), which worked to integrate ScanShift with software that Townsend Analytics had developed. Lozman testified he would not have consented to the formation of Terra Nova had Putnam not orally promised that Lozman would own 50% of Terra Nova.

¶ 8       In January 1995, Putnam agreed to extend trading privileges to Lozman at Terra Nova as an "affiliated" person. Additionally, by early 1995, Lozman and Putnam were aware that BWP could not receive soft dollar revenue earned through ScanShift without BWP being a registered broker-dealer with the SEC. Hence, on April 17, 1995, Lozman and Putnam agreed in writing to route all soft dollar revenue generated by BWP's ScanShift customers to Terra Nova, as an SEC-registered broker-dealer. Lozman and Putnam agreed to split the

profits from this revenue. The defendant attorneys had no involvement in the preparation of this agreement.

¶ 9    On June 30, 1995, Putnam ordered Lozman out of Terra Nova's offices and told him never to return. Putnam made clear he would have no further dealings with Lozman. The defendants had no involvement in the severance of the Lozman and Putnam relationship. Lozman testified that in 1995 following his ejection from Terra Nova's offices, he consulted with attorneys to discuss "all of the facts" regarding any potential claims he or BWP had against Putnam and those acting on Putnam's behalf.

¶ 10   In July 1995, Lozman, acting on behalf of BWP, terminated the attorney-client relationship with the defendants. Soon thereafter, Mason delivered all BWP corporate records to Lozman, along with a letter confirming that the defendants were no longer BWP's counsel. During the entire time the defendants served as counsel, BWP did not engage in any business and did not employ any persons.

¶ 11   In October 1995, Lozman and Putnam, without the assistance of any attorney, agreed to settle all claims arising from their business relationship, including the ownership of BWP. Lozman and Putnam negotiated, drafted, and executed a series of documents releasing any and all claims each had against the other, including those involving BWP and Terra Nova. As part of the October 1995 settlement agreement, Lozman became the sole owner of BWP. Since then, BWP has never engaged in business of any sort, and it was never registered with the SEC as a broker-dealer.

¶ 12   Lozman claimed he discovered that defendant Mason assisted Terra Nova in obtaining registration as a broker-dealer during the Putnam suit. According to Lozman, "[T]he first time I personally heard a lawyer from Foley & Lardner explain what they had done or not done regarding Blue Water Partners and Terra Nova Trading was when Mr. Mason testified at the trial of the Lozman and Putnam lawsuit in the fall of 2004." Lozman also stated that the first time he ever saw the books and corporate records of Terra Nova was during the Putnam suit's discovery phase.

¶ 13   During his deposition in the instant case, Lozman answered questions during cross-examination regarding his relationship with Foley & Lardner:

"Q. *** Did you at any time ever retain Foley & Lardner as your attorney, personally, you, Fane Lozman?

A. No.

Q. Did anyone from Foley & Lardner ever say anything to you that indicated to you that they believed you were being personally represented by Foley & Lardner?

A. No.

Q. You never made any payments to Foley & Lardner personally for any services. Correct?

A. *Foley & Lardner were Blue Water Partners' corporate attorney. They weren't my personal attorney.*" (Emphasis added.)

¶ 14   After the filing of the Putnam suit, the plaintiffs and the defendants entered into a series of written agreements tolling the time for BWP to file suit on its possible claims against the

-4-

defendant attorneys. The first tolling agreement was dated September 6, 2000, and provided:

"WHEREAS, BWP maintains that they have certain claims against F&L, including but not necessarily limited to those described in Exhibit A; WHEREAS, BWP and F&L wish to avoid the need to either commence or prosecute a lawsuit regarding those claims at this time; and

WHEREAS, BWP is currently involved in other litigation pending in the Circuit Court of Cook County, entitled *Fane Lozman, et al., vs. Gerald Putnam, et al.* Case No. 99 CH 11347 \*\*\* [the Putnam suit].

\* \* \*

The running of all statutes of limitations or repose and any other time bars of any nature whatsoever that may apply to any claim, cause of action or legal proceedings that BWP may have against F&L are tolled as of the date of this agreement and will remain tolled until one year from the date of this agreement."

The agreement made clear that claims timed-barred as of September 6, 2000, remained time-barred: "This agreement does not affect and will not resurrect any claims that are time barred as of the date of this agreement." The last tolling agreements expired on September 6, 2006. The instant suit was filed on September 1, 2006.

¶ 15                                    The Putnam Suit

¶ 16    In 1999, the plaintiffs filed an action under Cook County Circuit Court No. 99 CH 11347, against Putnam, Terra Nova, and other individuals and entities, including Townsend Analytics, alleging, among other claims, wrongful diversion of BWP's business opportunities (an equitable claim) and breach of promise (a legal claim). A combined bench and jury trial ensued in 2004. We take the following facts from the Putnam suit detailed in our 2008 decision in which we affirmed the judgment for Putnam. *Lozman*, 379 Ill. App. 3d 807.

¶ 17    The plaintiffs alleged that Putnam and three other individuals conspired against them by improperly diverting assets of BWP into other businesses controlled by Putnam, including Terra Nova. Lozman claimed that he received from Putnam an oral promise to share in the ownership of Terra Nova, as well as an oral promise to share equally in its profits from future business. The jury found that Putnam and Terra Nova usurped BWP's corporate opportunities, but rejected the plaintiffs' claim of breach of the alleged oral agreement regarding the ownership of Terra Nova and the claim of breach of a written agreement. Additionally, in special interrogatories, the jury found that the October 1995 release signed by Putnam and Lozman was not conditional, was just and equitable, and was signed by Lozman with full disclosure of all material facts. The jury found that the release was supported by consideration and covered all potential claims between Putnam and Lozman, including those regarding the named entities, entitling Putnam to a verdict in his favor.

¶ 18    Regarding the equitable claims in the Putnam suit, on July 25, 2005, the circuit court issued a written opinion finding, among other things, that the October 9, 1995 release barred all of the plaintiffs' claims. The court found the release was valid, it settled any and all obligations arising from the plaintiffs' past associations with Putnam and Terra Nova, and

it reflected the "full and complete disclosure of all material facts surrounding [Putnam and Lozman's] desire to be released from all obligations to the other party." The court noted that "Terra Nova Trading had already been established and operational for approximately one year" at the time of the release. The court further found that the release extinguished any claim that the plaintiffs had for usurpation of BWP's broker-dealer opportunity, reasoning that there was "no evidence *** in the Termination Agreement that Plaintiff Lozman wished to preserve any cause of action specifically regarding Terra Nova Trading for a usurpation of a broker-dealer claim." According to the court, the release placed the plaintiffs on notice "that Defendants planned to continue on with Terra Nova completely without Plaintiffs." As an alternative ground for finding in favor of Putnam, the court concluded that the plaintiffs' claims were barred by the doctrine of *laches*.

¶ 19    We affirmed the judgment of the circuit court on the basis of *laches*; we agreed that on the record evidence, the plaintiffs had sufficient knowledge of their claims grounded on Putnam's establishment of Terra Nova at the time the release was signed, and therefore the plaintiffs should have brought their claims sooner, as the circuit court ruled. *Lozman*, 379 Ill. App. 3d at 821.

¶ 20    During the trial on the Putnam suit, defendant Mason testified that he represented BWP, but did not represent Lozman or Putnam individually. He confirmed that Putnam was his principal contact for BWP. Mason testified that he met Lozman when he gave him BWP's corporate documents after he was discharged and he may have had one prior meeting with Lozman. Mason testified that he was not asked to draft any documents on Lozman's behalf and did not represent Lozman in connection with his fallout with Putnam. In fact, he "wouldn't have represented either of the individuals in connection with it. We represented Blue Water." Mason emphasized that he "did not represent Mr. Lozman."

¶ 21    During cross-examination, the following exchange occurred between Lozman's attorney and defendant Mason:

"Q. You were indirectly representing Mr. Lozman as a substantial interest holder in Blue Water Partners, weren't you?

A. We were representing the company, and to the extent he was a substantial interest holder, there would have been, in a manner of speaking, an indirect representation.

Q. And you were representing at some point in time Jerry Putnam, too, right?

A. Well, really Terra Nova Trading, of which Jerry Putnam owned substantially all or all of the interest.

Q. So who were your clients then in–

A. We regarded our clients as being Blue Water Partners as a corporation, and Terra Nova Trading, the LLC."

¶ 22                                    Procedural History

¶ 23    On September 1, 2006, the plaintiffs filed suit against the defendants for professional negligence arising from their representation of BWP. The complaint alleged that in 1994, Lozman and Putnam entered into a business relationship and created BWP, an electronic

trading brokerage business. Mason prepared BWP's incorporation papers, shareholder agreements, and other corporate formation documents. The BWP documents prepared by Mason designated Putnam as the president and chief executive officer and Lozman as the vice-president of BWP, with each as a director and equal shareholder of BWP. Mason also prepared regulatory forms required by the federal and state government that were signed by Putnam on behalf of BWP. All documents prepared by Mason identified BWP's principal business as "providing securities broker/dealer services to financial institutions." The complaint alleged that Lozman was an intended beneficiary of the attorney-client relationship the defendants had with BWP.

¶ 24    According to the complaint, in November 1994, after BWP's incorporation, Mason drafted and filed formation papers for Terra Nova as a broker-dealer, at the request of Putnam. Putnam served as BWP's president when Terra Nova was formed. The instant complaint alleged, "The difference between the two broker/dealer companies incorporated by MASON was that plaintiff LOZMAN owned 50% of BWP, but MASON, at PUTNAM'S request, set up TERRA NOVA to be a limited liability company of which PUTNAM effectively was the 100% owner." The defendants obtained broker-dealer registration and a broker-dealer license for Terra Nova in January 1995; Mason did not obtain such registration or licensing for BWP. The complaint explained that Putnam usurped BWP's broker-dealer business and diverted it to Terra Nova while serving as president of BWP in violation of the corporate opportunity doctrine.

¶ 25    The complaint alleged the defendant attorneys breached their duty to the plaintiffs in six ways: (1) setting up Terra Nova, which was wholly owned by Putnam, as a competitor to BWP; (2) failing to disclose to the plaintiffs that they had set up Terra Nova in such a way; (3) assisting Terra Nova in registering as a broker-dealer and receiving a broker-dealer license while not obtaining such registration or license for BWP; (4) failing to disclose that they had assisted Terra Nova in registering as a broker-dealer and obtaining a broker-dealer license; (5) failing to disclose that "the significant corporate developments *** were undertaken solely to benefit Putnam, to the exclusion of BWP and Lozman"; and (6) "assist[ing], aid[ing] and abett[ing] PUTNAM'S breach of fiduciary duty to BWP." Finally, the complaint alleged that the parties entered into tolling agreements regarding the running of the statute of limitations, with the last agreement expiring on September 6, 2006, five days after suit was filed.

¶ 26    On March 19, 2007, the defendants filed an amended answer, with several affirmative defenses. The defendants asserted that the plaintiffs' claims were barred by the statute of limitations, irrespective of the tolling agreements. The defendants asserted that the allegations of negligence in the complaint concerned events occurring more than two years prior to the date of the initial tolling agreement of September 6, 2000. The defendants claimed that the plaintiffs were aware of the facts underlying the alleged breaches of their duty of care no later than October 9, 1995, the date of the release signed by Putnam and Lozman. The defendants further asserted that the plaintiffs' claims were barred by the executed release and by the doctrines of collateral estoppel and *laches*. Finally, the defendants asserted Lozman lacked standing to sue the defendants for professional negligence as they never served as attorneys for Lozman.

¶ 27 On May 15, 2009, the defendants, consistent with the asserted affirmative defenses, filed separate motions for summary judgment. The defendants claimed Lozman lacked standing to sue on his own behalf for legal malpractice as no attorney-client relationship ever existed with Lozman. The defendants claimed that in any event, the claims of both plaintiffs were time-barred as the plaintiffs had knowledge of the facts underlying their claims more than two years before the initial tolling agreement was signed on September 6, 2000. In the alternative, the defendants claimed they were entitled to summary judgment because the plaintiffs' claims that the defendants breached their duty to BWP were unsupported by any facts.

¶ 28 On January 19, 2010, the plaintiffs filed their responses to the summary judgment motions, which included affidavits of two expert witnesses and a Rule 213 disclosure (Ill. S. Ct. R. 213 (eff. Jan. 1, 2007)) from another expert witness. In one affidavit, expert witness Geoffrey C. Hazard, Jr., averred that (1) an attorney-client relationship existed between the defendants and Lozman, (2) Lozman reasonably understood that such a relationship existed, in circumstances where it was evident to the attorneys that Lozman could and did so believe, and (3) an attorney-client relationship existed between the defendants and BWP, which relationship induced Lozman to rely on the firm for legal assistance. Hazard opined that the defendant firm did not give reasonable attention to Lozman's interests in the BWP matter. Hazard faulted the defendants for (1) failing to document a transfer to BWP of the intellectual property interest of Townsend Analytics in ScanShift, arising from their technical work with ScanShift, (2) failing to take notice that Townsend Analytics had not consummated the transaction in which that transfer was to have occurred, (3) failing to disclose from December 1994 through January 1995 to Lozman that Townsend Analytics had not consummated the transaction, (4) assisting Putnam in November 1994 to establish Terra Nova, a prospective competitor of BWP, while it was reasonably foreseeable that Putnam could and did use it as a vehicle to exploit the ScanShift concept, and (5) failing to discuss the foregoing with Lozman when the attorney-client relationship with BWP ended in July 1995.

¶ 29 Hazard opined that these failures constituted a deviation from recognized standards of professional conduct and were in conscious disregard of their professional responsibilities to the plaintiffs. He further opined that they were a contributing cause of substantial injury to the plaintiffs in the reduction of the economic value of the intellectual property in the ScanShift concept and the business development of the soft dollar brokerage business contemplated and begun by the parties. Hazard affirmed that he held these opinions to a reasonable degree of legal and professional certainty.

¶ 30 Concerning the Rule 213 disclosure of Norman Frager, the plaintiffs claimed that Frager would testify as a securities expert that BWP and Terra Nova were in the same line of business and that businesses later developed by Putnam were reasonably incidental to BWP.

¶ 31 On March 22, 2010, the defendants filed a motion to strike each of the plaintiffs' proffered expert opinions. The defendants argued that Frager's opinion should be stricken because it was based on Frager's trial testimony from the Putnam suit and not proffered in affidavit form. On June 21, 2010, the court granted the motion as to Frager, but denied the motion to strike the affidavits of the two other experts. On the same day, the circuit court

granted the defendants' motion for summary judgment against Lozman based on the absence of an attorney-client relationship.

¶ 32      On July 23, 2010, the circuit court granted the defendants' motion for summary judgment against BWP as barred by the two-year statute of limitations. In its order, the court listed certain facts as uncontroverted: (1) Lozman's testimony during the Putnam suit demonstrated "extensive contemporaneous knowledge of Terra Nova's formation including the defendants' involvement"; (2) Lozman's knowledge, including his knowledge of Terra Nova when he voluntarily and knowingly signed the October 1995 release, is imputed to BWP; and (3) at the time the October 1995 release was signed, Lozman, and hence BWP, knew that Putnam intended to continue operating Terra Nova as a broker-dealer business. The court concluded that BWP knew or should have known of the facts underlying BWP's cause of action for legal malpractice when the release was executed because Lozman knew that neither he nor BWP had any ownership interest in Terra Nova. The court concluded that Lozman had direct knowledge that Terra Nova was a securities broker-dealer when it was formed as Lozman claimed one-half ownership in Terra Nova, which Lozman contended Putnam orally promised. Lozman and Putnam had also agreed in writing on April 17, 1995, to route all soft dollar revenue generated by ScanShift trading customers to Terra Nova, as an SEC-registered broker-dealer. Lozman was also provided the corporate documents pertaining to BWP in July 1995, which revealed that BWP was not a registered broker-dealer with the SEC. While Lozman sought to explain away this knowledge by his contention that he did not review the documents until 2000, after discovery had commenced in the Putnam suit, the court noted that Lozman testified at his deposition that he consulted with an attorney in 1995 about potential claims he and BWP might have against Putnam, Terra Nova, and the Townsends and their firm, which eventually gave rise to the Putnam suit filed in 1999. According to Lozman's 2004 trial testimony, by April 1995 he was questioning where his Terra Nova ownership documents were.

¶ 33      The court also concluded that the deposition testimony of BWP's Rule 206(a)(1) witness (Ill. S. Ct. R. 206(a)(1) (eff. Dec. 1, 1999)) supported that BWP knew or should have known about possible claims against the defendants. The court listed four facts or inferences supported by the testimony: (1) at some point in 1995, Putnam and Lozman had an understanding that Terra Nova would be set up as a broker-dealer; (2) Lozman and/or BWP claimed to have an interest in Terra Nova; (3) Terra Nova, organized as a broker-dealer, was not meant to exclude BWP from serving as a broker-dealer; and (4) at the time Terra Nova was incorporated, Lozman knew that the defendants were legal counsel to both BWP and Terra Nova.

¶ 34      Based on the foregoing, the circuit court issued four findings of fact in granting the defendants' motion for summary judgment as time-barred regarding the claims by BWP: (1) Lozman, as BWP's agent, had sufficient information in 1995 to know that the defendants, at Putnam's direction, registered Terra Nova as an SEC-registered broker-dealer; (2) Lozman was aware that the legal work for Terra Nova was performed by the defendants while the defendants served as counsel for BWP; (3) BWP, through its agent Lozman, knew or should have known, at the time the release was signed by Lozman, that the defendants engaged in purportedly wrongful conduct against BWP by incorporating Terra Nova, which allegedly

injured BWP by competing against it; and (4) Lozman took no action to initiate a lawsuit against the defendants for professional negligence on behalf of BWP within two years of acquiring that knowledge. The court granted the defendants' motion for summary judgment as to BWP "on the statute of limitations issue solely." The plaintiffs timely appeal.

¶ 35                                                ANALYSIS

¶ 36     The plaintiffs argue that the circuit court erred in (1) finding their claims barred by the statute of limitations and (2) concluding that Lozman was not a client of the defendant attorneys. We first address Lozman's contention that an attorney-client relationship existed.

¶ 37                                    Lozman's Malpractice Claim

¶ 38     Generally, to go forward on a legal malpractice claim, a plaintiff must first establish the existence of an attorney-client relationship that gave rise to a duty of care on the part of the attorney. *Felty v. Hartweg*, 169 Ill. App. 3d 406, 408 (1988) ("An attorney can be liable for malpractice only to one to whom the attorney has a duty."). The question of whether a duty exists is one of law that the circuit court answers in the first instance. *Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930, 934 (2004). A duty of care to a third party may arise "where [the attorney is] hired by the client specifically for the purpose of benefitting that third party." *Kopka*, 354 Ill. App. 3d at 934. Thus, "for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." *Pelham v. Griesheimer*, 92 Ill. 2d 13, 21 (1982). Proof of intent to benefit or influence a third party must be specific. A claim that the third party is a shareholder in the corporation is by itself insufficient to establish a duty on the part of the attorney for the corporation in favor of the shareholder third-party. See *Kopka*, 354 Ill. App. 3d at 939-40; *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 270 (1995); *Felty*, 169 Ill. App. 3d at 408.

¶ 39     In the instant case, Lozman contends he was the client of the defendants; but if not, then Lozman contends he was an intended beneficiary of the defendants' representation of BWP.

¶ 40     At his deposition in this case, Lozman confirmed he was not a client of Foley & Lardner:

"Q. *** Did you at any time ever retain Foley & Lardner as your attorney, personally, you, Fane Lozman?

A. No.

Q. Did anyone from Foley & Lardner ever say anything to you that indicated to you that they believed you were being personally represented by Foley & Lardner?

A. No.

Q. You never made any payments to Foley & Lardner personally for any services. Correct?

A. *Foley & Lardner were Blue Water Partners' corporate attorney. They weren't my personal attorney*." (Emphasis added.)

That the attorney-client relationship between BWP and the defendant attorneys did not

extend to Lozman is supported by the initial tolling agreement, which listed only BWP as having possible claims against Foley & Lardner: "WHEREAS, BWP maintains that they have certain claims against F&L, including but not necessarily limited to those described in Exhibit A."

¶ 41    In the face of this unequivocal evidence that no attorney-client relationship ever arose with the defendants, Lozman nonetheless argues that an attorney-client relationship arose based on "defendants' efforts on Lozman's behalf," which he contends is bolstered by the expert opinion of Geoffrey C. Hazard, Jr. We remain unpersuaded.

¶ 42    The Hazard expert opinion provides little support that an attorney-client relationship existed between Lozman and Foley & Lardner. "Whether a duty exists is a question of law for the court to decide." *Washington v. City of Chicago*, 188 Ill. 2d 235, 239 (1999). "In resolving whether a duty exists, a court must determine whether there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other." *Id.* "The factors relevant to the courts' imposition of a duty include the reasonable foreseeability of injury, the likelihood of such injury, the magnitude of guarding against the injury, and the consequences of placing that burden on the defendant." *Id.* Hazard's expert opinion fails to address the "factors relevant to the court's imposition of a duty." *Id.* Nor has Lozman provided this court with any case law that found an attorney-client relationship existed under facts similar to those of this case. As we pointed out above, the facts (including statements under oath by Lozman) support only one conclusion: that no attorney-client relationship ever existed between Lozman and the defendant attorneys.

¶ 43    Nor does the record evidence support, either directly or as matter of inference, that defendant Mason was "hired by [BWP] *** for the [primary] purpose of benefitting [Lozman]." *Kopka*, 354 Ill. App. 3d at 934; *Pelham*, 92 Ill. 2d at 21 (to establish a duty owed by an attorney to a third party, evidence must establish "that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party"). For the nearly two years the attorney-client relationship existed between BWP and the defendant attorneys, from March 1994 to July 1995, nothing in the record reveals an intent of the relationship to either benefit or influence Lozman. See *Kopka*, 354 Ill. App. 3d at 935-36 (claim that attorney knew or should have known that shareholder would rely on the services of the attorney insufficient by itself to give rise to a duty of care); *Hager-Freeman v. Spircoff*, 229 Ill. App. 3d 262, 277-78 (1992) (an attorney for a corporation, even a closely held one, does not have a fiduciary duty toward an individual shareholder); *Majumdar*, 274 Ill. App. 3d at 270-71 (no facts alleged in the attorney malpractice complaint that the individual plaintiff was a third-party beneficiary of the engagement of the defendant attorneys to draft the corporate stock purchase agreement, whereby the malpractice plaintiff acquired an interest in the corporation, to trigger a duty owed by the defendant attorneys to the plaintiff); *Felty*, 169 Ill. App. 3d at 410 ("The allegation that [the defendant attorney] should have known he was expected to protect the minority shareholders is an allegation which places upon him a duty not imposed by law.").

¶ 44    We agree with the defendants that the evidence establishes that as a matter of law Lozman was not their client. We affirm the circuit court's grant of summary judgment as the defendant attorneys owed no duty of care to Lozman.

¶ 45                    Timeliness of BWP's Malpractice Claim

¶ 46        In our 2008 decision, we affirmed the circuit court's judgment in favor of Putnam
regarding the plaintiffs' claim of usurpation of corporate opportunities on the alternate
ground that the claim was barred by *laches*. *Lozman*, 379 Ill. App. 3d at 821. To prevail on
the affirmative defense of *laches*, two elements must be proved: (1) there was a lack of
diligence in the suit brought by the plaintiffs; and (2) the resultant delay prejudiced the
defendants. *Id.* at 822. Our affirmance of the judgment in favor of Putnam as barred by
*laches* necessarily means that both elements were satisfied. Thus, in this appeal, we take as
an established fact that Lozman and BWP were not diligent in bringing suit against Putnam
and others on August 9, 1999, when the Putnam suit was filed. *Id.* at 815; see also *People
v. Jones*, 207 Ill. 2d 122, 138-39 (2003); *People v. Tenner*, 206 Ill. 2d 381, 396 (2002) (both
cases applying collateral estoppel). In our 2008 decision, we noted that the relationship
between Lozman and Putnam was formally dissolved on October 9, 1995, yet Lozman waited
almost four years to file suit. *Lozman*, 379 Ill. App. 3d at 815.

¶ 47        It necessarily follows from our conclusion in *Lozman* that the plaintiffs lacked diligence
in filing suit against Putnam (and others) in 1999, that BWP's suit filed in 2006 against the
Putnam attorneys for conduct that occurred contemporaneously with Putnam's conduct as
alleged in the Putnam suit, was barred by the two-year statute of limitations for professional
negligence before the date of the first tolling agreement of September 6, 2000. That is,
*unless*, as BWP claims, the statute of limitations was tolled until judgment was rendered in
the Putnam suit on July 6, 2005, under the "adverse judgment accrual rule," as they term it.[2]

¶ 48        "An action for damages based on tort, contract, or otherwise *** against an attorney
arising out of an act or omission in the performance of professional services" must be
commenced within two years "from the time the person bringing the action knew or
reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-
214.3(a) (West 2008). This statute of limitations incorporates the " 'discovery rule,' " "which
serves to toll the limitations period to the time when a person knows or reasonably should
know of his or her injury." *Hester v. Diaz*, 346 Ill. App. 3d 550, 553 (2004). "[A] cause of
action for legal malpractice does not accrue until a plaintiff discovers, or within a reasonable
time should discover, his injury and incurs damages directly attributable to counsel's
neglect." *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 353
(1998). "The time at which a party has or should have the requisite knowledge under the
discovery rule to maintain a cause of action is ordinarily a question of fact." *Jackson Jordan,
Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 250 (1994) (citing *County of Du Page v.
Graham, Anderson, Probst & White, Inc.*, 109 Ill. 2d 143, 154 (1985)).

¶ 49        Thus, summary judgment is appropriate in the instant case only if the undisputed facts
compel the conclusion that the statute of limitations lapsed before September 6, 2000, the
date of the first tolling agreement. *Jackson Jordan*, 158 Ill. 2d at 250 (noting that with a five-
year limitations period, "summary judgment *** would be appropriate only if the undisputed

---

[2]Of course, if BWP's malpractice claim did not accrue until judgment was entered in the
Putnam suit, we question what purpose the tolling agreements served.

facts allow for only one conclusion: that more than five years elapsed between the time [the plaintiff] knew or should have known of its injury and *** the date [the plaintiff] filed its complaint"). "For purposes of a legal malpractice action, a client is not considered to be injured unless and until he has suffered a loss for which he may seek monetary damages." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005).

¶ 50    BWP, as the only plaintiff with an attorney-client relationship with the defendant attorneys, contends it did not discover the injury attributable to the defendant attorneys until the discovery phase of the Putnam suit in approximately 2004, even though the defendant attorneys committed the alleged malpractice no later than 1995, when the attorney-client relationship was severed. On the other hand, the defendants contend that BWP had knowledge of the operation of Terra Nova as a broker-dealer business no later than October 1995 when Lozman and Putnam signed the release. The defendants contend that when the release was signed, BWP knew or should have known of injury directly attributable to the alleged malpractice of the defendants. BWP insists, however, that it did not become aware that the defendant attorneys participated in setting up Terra Nova as a competitor to BWP until 2004, during discovery in the Putnam suit, and that damages were not realized until judgment was entered in the Putnam suit in 2005. As support for BWP's lack of knowledge of the conduct of the defendant attorneys in the instant suit, in contrast to its knowledge of Putnam's conduct in the Putnam suit, BWP points to the circuit court's order that "Blue Water Partners categorically stated throughout its submissions, and in open court during the hearings, that Fane Lozman never knew what the defendants did, or did not do, with respect to the work that they performed for both Blue Water Partners and Terra Nova Trading."

¶ 51    Actual knowledge of the alleged malpractice, however, is not a necessary condition to trigger the running of the statute of limitations. *SK Partners I, LP v. Metro Consultants, Inc.*, 408 Ill. App. 3d 127, 130 (2011) ("under the discovery rule, a statute of limitations may run despite the *lack* of actual knowledge of negligent conduct" (emphasis in original)). A statute of limitations begins to run when the purportedly injured party "has a reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue." (Internal quotation marks omitted.) *Id.* Under the facts of this case, there can be little dispute that BWP, through Lozman, acted on its obligation to inquire further on possible wrongful conduct following the demise of the BWP venture with Putnam in 1995, when, as Lozman testified at his deposition, he consulted with an attorney about potential claims against Putnam and those acting on Putnam's behalf, which consultation apparently gave rise to the Putnam suit, albeit the plaintiffs lacked diligence in filing suit in 1999. *Lozman*, 379 Ill. App. 3d at 821. Nonetheless, BWP contends it did not have a reasonable belief in 1995 that the defendant attorneys wrongfully assisted Putnam in the wrongful conduct alleged against him in the 1999 suit.

¶ 52    Of course, BWP is attributed with all knowledge Lozman held as the sole shareholder and corporate officer of BWP following the October 1995 release. See *Metropulos v. Chicago Art Glass, Inc.*, 156 Ill. App. 3d 727, 740 (1987) (knowledge of a corporate officer is imputed to the corporation). Accepting at face value Lozman's contention that he did not know of Mason's involvement in the formation of Terra Nova or the legal work he

performed to register Terra Nova as a broker-dealer with the SEC[3], it is beyond dispute that as of October 1995, Lozman knew both that Terra Nova came into existence as a corporate entity and that Terra Nova was registered with the SEC as a broker-dealer, a fact unequivocally established by the April 17, 1995 agreement Lozman and Putnam signed that routed soft money revenue earned by ScanShift at BWP through Terra Nova. It also cannot be disputed that upon the transfer of BWP corporate documents to Lozman by defendant Mason, Lozman had the information to confirm that BWP was never registered with the SEC as broker-dealer, which Lozman faults the defendant attorneys for not completing, an obligation that could not have been fulfilled after July 1995, when the defendant attorneys were discharged by BWP.

¶ 53    These two undisputed facts, if not constituting actual knowledge that Mason was involved as the circuit court found, were sufficient to trigger an obligation by BWP to inquire whether Mason or anyone else at Foley & Lardner had any involvement in establishing Terra Nova. See *SK Partners*, 408 Ill. App. 3d at 130-31 (in an accounting malpractice suit, the plaintiffs' claim that they did not acquire "actual knowledge of damages relative to defendant's conduct" to begin the running of the statute of limitations until the IRS issued a refund check was rejected in light of the allegations in the plaintiffs' complaint that the defendant's accounting mistake forced the plaintiffs "to amend their tax returns" to seek recovery of an overpayment to the IRS, which necessarily involved the wrongful loss of the plaintiffs' income). Even in the face of these two irrefutable facts, BWP argues that it suffered no actual damages until judgment was entered against the plaintiffs in the Putnam suit, for which BWP contends *Lucey* is direct authority.

¶ 54    In *Lucey*, the malpractice plaintiff sought advice from the defendant law firm "regarding the propriety of soliciting clients prior to his resignation [to start his own company]." *Lucey*, 301 Ill. App. 3d at 351. Upon following the advice of the defendant law firm, the former employer of the plaintiff filed suit "based upon the loss" of a client's account to the plaintiff's new company. *Lucey*, 301 Ill. App. 3d at 352. The plaintiff retained the defendant law firm to represent him in his former employer's suit. *Id.* The law firm continually reassured the plaintiff that he had a valid defense to the lawsuit by his former employer. *Id.* The plaintiff eventually discharged the defendant law firm for reasons unrelated to the pending lawsuit and hired other counsel. While the lawsuit involving the plaintiff's former employer was pending, the plaintiff filed suit against the defendant law firm for legal malpractice based on negligent advice. *Id.*

¶ 55    The law firm filed a motion to dismiss the complaint pursuant to section 2-619 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 1996)), arguing that the plaintiff's action was barred by the then-statutory period of limitations of five years. *Lucey*,

---

[3]Without relying on this finding, there is good reason for the circuit court's ruling on summary judgment that Lozman, as BWP's agent, knew in 1995 that the legal work for Terra Nova was performed by the defendant attorneys. At the very least by October 1995, Lozman had a reasonable belief that Terra Nova's existence was owed to legal work by an attorney, which triggered a legal obligation by Lozman to inquire whether that legal work was performed by the defendant attorneys, given his knowledge of Putnam's reliance on defendant Mason for legal work.

301 Ill. App. 3d at 352. The circuit court dismissed the complaint with prejudice, though it held the malpractice claim was *premature* because the plaintiff had not sustained any damages arising from the allegedly negligent advice from the defendant firm, as the former employer's lawsuit was still pending. *Id*.

¶ 56    On review, this court engaged in a lengthy discussion centered on the unresolved litigation involving the malpractice plaintiff and his former employer. We explained an essential element of legal malpractice is "actual damages." *Id.* at 353. "Where the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists." *Id*. This court noted that while the law firm may have breached its duty when it gave the plaintiff allegedly negligent advice, the cause of action for legal malpractice does not accrue "until [the] plaintiff discovers, or within a reasonable time should discover, his injury and incurs damages directly attributable to counsel's neglect." *Id*.

¶ 57    In determining when the plaintiff's malpractice action accrued, the *Lucey* court looked at the date the defendant law firm withdrew as counsel, which caused the plaintiff to incur attorney fees to defend himself in the litigation brought by his former employer. The court rejected the rule that incurring attorney fees should constitute damages "directly attributable to *** counsel's neglect" so as to trigger a legal malpractice suit against former counsel. *Id.* at 355. The court noted that while the attorney's negligent advice may have caused the plaintiff to incur attorney fees, the fees did not constitute actual damages because the converse was also true: "[W]here an attorney's neglect is *not* a direct cause of the legal expenses incurred by the plaintiff (*i.e.*, the plaintiff prevails when sued or loses for reasons other than incorrect legal advice), the attorney fees incurred are generally not actionable." (Emphasis in original.) *Id*. Thus, the court ruled the legal malpractice action did not accrue until the former employer's suit against the plaintiff ended:

> "Since it is also possible the former client will prevail when sued by a third party, damages are entirely speculative until a judgment is entered against the former client or he is forced to settle. When uncertainty exists as to the very fact of damages, as opposed to the amount of damages, damages are speculative [citation], and no cause of action for malpractice can be said to exist." *Id*.

¶ 58    The *Lucey* court then set forth what BWP refers to as the "adverse judgment accrual rule." "[A] cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Id.* at 356. The court reasoned that to require a client to file a provisional malpractice action whenever an attorney's legal advice is called into question would undermine the policy favoring judicial economy and the preservation of the attorney-client relationship. *Id.* at 357. The *Lucey* court concluded that the circuit court was correct in dismissing the complaint as *premature*: "This is not a case where it is plainly obvious, prior to any adverse ruling against the plaintiff, that he has been injured as the result of professional negligence." *Id.* at 358. In other words, it cannot be said that the plaintiff knew or reasonably should have known that the legal advice was erroneous when he was sued by his former employer. *Id.* The court concluded that the client sustained no "actual damages" until the former employer's lawsuit is resolved

-15-

adversely to the malpractice plaintiff. *Id.* at 359. This necessarily meant that the circuit court erred by entering its order of dismissal *with prejudice*. *Id.* The plaintiff's malpractice action had not yet accrued in the absence of sustaining actual damages, which entitled the malpractice plaintiff to refile his complaint should his former employer's suit be resolved adversely to his interests. *Id*. at 359-60.

¶ 59   It is plainly evident that the circumstances in *Lucey* are not the circumstances present in the instant case. As the *Lucey* court made clear, accrual of a legal malpractice action is delayed until there is an adverse judgment where the "plaintiff has become entangled [in litigation] due to the purportedly negligent advice of his attorney." *Id.* at 356. Public policy favors such a delay to permit a determination as to whether the advice of counsel was in fact negligent. *Id.* If the malpractice plaintiff is found not liable in the underlying suit, then the favorable termination of the suit forecloses the element of damages. If the malpractice plaintiff is found liable in the underlying suit, then the converse is true, with the malpractice plaintiff suffering actual damages attributable to the negligent advice of counsel. Thus, a legal malpractice action has not accrued when the question of whether the malpractice plaintiff has actually been damaged has yet to be resolved in an underlying suit by a finding that the attorney gave negligent advice. In other words, as the circumstances in *Lucey* make clear, the adverse judgment accrual rule applies where the "plaintiff has become entangled [in litigation] due to the purportedly negligent advice of his attorney." *Id.* at 356. Whether the advice by the attorney was in fact negligent must be resolved for the policy reasons stated in *Lucey* before the malpractice suit accrues. *Id.* at 357. We do not address a claim of negligent advice in the instant case.

¶ 60   Other cases discussing legal malpractice make clear as well that the context of the alleged malpractice determines the elements of proving malpractice. The accrual of a legal malpractice cause of action depends on whether the "legal malpractice action involv[es] negligence in the prosecution of a case [or] negligence in the defense of a case." *Fox v. Seiden*, 382 Ill. App. 3d 288, 299 (2008) (rejecting the defendant attorneys' claim that the malpractice complaint had to allege "that any portion of the judgment [entered against the malpractice plaintiff] had been paid" when the claims against the attorneys were based on inadequate representation in defending the malpractice plaintiff (citing *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306-07)). The circumstances of the alleged professional negligence often determines when a cause of action accrues to begin the running of the statute of limitations as the *SK Partners* decision made clear. *SK Partners*, 408 Ill. App. 3d at 130-31 (the accrual of an accounting malpractice action differs between allegations involving underpayment of taxes (a cause of action is triggered "when the taxpayer receives the statutory notice of deficiency *** or at the time when the taxpayer agrees with the IRS' proposed deficiency assessments" (internal quotation marks omitted)) and allegations involving overpayment of taxes to the IRS ("actual damages occurred at the moment taxes are overpaid")).

¶ 61   The cases of *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 368 (2007), and *Learning Curve International, Inc. v. Seyfarth Shaw LLP*, 392 Ill. App. 3d 1068 (2009), are analogous to *Lucey*, which renders each equally inapposite to the case at hand.

¶ 62   In *Warnock*, the plaintiffs claimed the defendant law firm committed negligence in the

drafting of a letter to the buyers of real estate, which forced the plaintiffs to relinquish the escrow funds that otherwise would have constituted liquidated damages when the buyers were unable to consummate the purchase. *Warnock*, 376 Ill. App. 3d at 366-67. We concluded the plaintiffs suffered no damages until the suit over the escrow fund ended. "Since plaintiffs did not actually discover and reasonably could not have discovered that the letter agreements drafted by [a partner at the law firm] were negligently prepared until the circuit court entered judgment on the pleadings in the [buyers'] favor, we conclude that the entry of that adverse judgment marked the date on which the statute of limitations commenced." *Id.* at 370.

¶ 63    In *Learning Curve*, the malpractice plaintiff contended its legal counsel gave bad advice when it recommended against settling a lawsuit for $350,000. Eventually, Learning Curve paid a judgment in excess of $11 million. *Learning Curve*, 392 Ill. App. 3d at 1071. In following *Lucey* and *Warnock*, the *Learning Curve* court concluded that the adverse jury verdict alerted the plaintiff that its potential liability "exceeded the worst case scenario its attorneys had envisioned." *Id.* at 1078. The jury's verdict, however, did not trigger the running of the statute of limitations because the federal district court did not enter judgment on that verdict. *Id.* It was not until the decision of the Seventh Circuit Court of Appeals reinstating the jury verdict and remanding for the possible imposition of exemplary damages against Learning Curve that the legal malpractice suit accrued. Only then did "the malpractice and its consequential damages [become] 'painfully obvious.' " *Id.* (quoting *Warnock*, 376 Ill. App. 3d at 372). The *Learning Curve* court ruled that the statute of limitations did not bar the plaintiff's legal malpractice cause of action because it was filed within two years of the decision by the federal court of appeals. *Learning Curve*, 392 Ill. App. 3d at 1078.

¶ 64    In the case at bar, BWP attempts to explain why the date of judgment in the Putnam suit marks the running of the statute of limitations. BWP asserts that the "plaintiffs were litigating against Putnam to obtain their legal rights because of defendants' negligent representation in the corporate transactions mishandled by plaintiffs' corporate lawyers." The defendants, on the other hand, claim that the adverse judgment accrual rule does not apply because "the Putnam Litigation had no effect on the accrual of BWP's claims against these Defendants." On the record before us, we do not hesitate to agree with the defendants.

¶ 65    The predicament BWP found itself in prior to the Putnam suit remained the same after the resolution of the Putnam suit in Putnam's favor. BWP fails to tell us what the judgment in the Putnam suit established that did not exist before the judgment was entered. We know that in *Lucey*, the underlying lawsuit had to be resolved to know whether the advice by counsel was in fact negligent. In fact, if we were to apply the logic in *Lucey*, then that logic would dictate that the judgment in favor of Putnam in the Putnam suit is like the former client prevailing in the suit by his former employer, which translates into "no cause of action for malpractice can be said to exist." *Lucey*, 301 Ill. App. 3d at 355. Unlike *Lucey*, *Warnock*, and *Learning Curve*, where a judgment against the former client in the underlying suit would confirm legal malpractice by giving rise to actual damages directly attributable to the negligent advice of counsel, the judgment in the Putnam suit did nothing to confirm the *existence* of damages allegedly suffered by BWP. See *Northern Illinois Emergency*

-17-

*Physician*, 216 Ill. 2d at 307 ("Damages are considered to be speculative *** only if their existence itself is uncertain, not if the amount is uncertain or yet to be fully determined."). The Putnam suit judgment added nothing to the malpractice cause of action against the defendant attorneys, which, if it occurred at all, had to have occurred on or before they were discharged as counsel for BWP in July 1995. The judgment in the Putnam suit did not crystalize the "legal rights" of BWP; nor did the judgment make "painfully obvious," in the words of the *Warnock* court, any alleged negligence on the part of the defendant attorneys.

¶ 66    Under the facts of this case, the cause of action against the defendant attorneys accrued contemporaneously with the cause of action against Putnam. When the 1999 Putnam suit was properly dismissed based on *laches* for events that occurred no later than 1995, it necessarily followed that the suit against the Putnam attorneys, not filed until 2006 based on the same events as in the Putnam suit, was barred by the two-year statute of limitations, notwithstanding the tolling agreements first signed on September 6, 2000.

¶ 67    We note that in the Putnam suit, BWP and Lozman litigated over the broker-dealer business of Terra Nova. The thrust of the malpractice claim in the instant complaint is that the defendant attorneys wrongfully assisted Putnam in establishing Terra Nova. The two claims, that against Putnam *vis-à-vis* Terra Nova and that against the Putnam attorneys for assisting Putnam in establishing Terra Nova, were inseparable. The two causes of action accrued jointly and should have been resolved in the same lawsuit. Of course, had the jury in the Putnam suit found no breach of duty by Putnam in establishing Terra Nova, BWP could prove no breach of duty against the defendant attorneys. That similarity to the *Lucey* decision alone does not render BWP's legal malpractice claim against the defendant attorneys premature in the context of the Putnam suit. Unlike the rationale in the line of cases beginning with *Lucey*, no public policy would have been undermined had BWP named the defendant attorneys in the suit filed against Putnam in 1999 as the attorney-client relationship ended in 1995 and judicial economy favored resolving the related claims in a single suit. Had the plaintiffs prevailed in the Putnam suit, the same jury could then have determined whether any damages suffered by the plaintiffs by Putnam's wrongful conduct were "proximately caused" as well by the defendant attorneys. See *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 311. The element of damages purportedly suffered by BWP by the alleged malpractice of the defendant attorneys was inextricably tied to the claims of BWP and Lozman against Putnam litigated in the 1999 suit. The litigation at the center of the Putnam suit did not give rise to any "uncertainty *** as to *** damages" (*Lucey*, 301 Ill. App. 3d at 355) proximately caused by the defendant attorneys, which had to await a judgment in the Putnam suit before a legal malpractice suit accrued as to the defendant attorneys. Of course, had the defendant attorneys been sued along with Putnam in 1999, the verdict in Putnam's favor would have meant as well a verdict for the defendant attorneys, which is the same result we reach here.

¶ 68    As an alternative basis to affirm the dismissal by the circuit court, the defendants argue that the prospect of competition between two businesses does not trigger a duty to disclose by the attorneys incorporating each of the businesses, a proposition which the defendants contend is established by *Majumdar*. In that case, the plaintiff was an officer and director of the Bel-Austin Medical Corporation (Bel-Austin) when he contacted the defendant attorneys

-18-

and requested that they represent him in forming another medical corporation, independent of Bel-Austin. *Majumdar*, 274 Ill. App. 3d at 268-69. The plaintiff later engaged in litigation with Bel-Austin, which alleged that he breached his fiduciary duty to the corporation by engaging in direct competition. *Id*. at 269. After settling that claim, the plaintiff brought suit against the defendant attorneys, alleging that they failed to advise him of his fiduciary duties to Bel-Austin and engaged in a conflict of interest by representing the plaintiff in forming the corporation and serving as corporate legal counsel for Bel-Austin. *Id*.

¶ 69        This court agreed that no duty was owed to the plaintiff, in his capacity as a shareholder, by the incorporating attorneys, much as the defendant attorneys argued here as to Lozman. *Id*. at 270. An attorney for a corporate client owes a duty to the corporation, not to a shareholder. *Id*. The court further found that the facts pled did not suggest that the defendants knew or should have known that the plaintiff's corporation intended to engage in direct competition with Bel-Austin, similar to the defendants' contention here that BWP and Terra Nova were not necessarily direct competitors. The *Majumdar* court was "unwilling to hold that attorneys are required to exercise clairvoyance to discharge the obligation" of informing clients of the risks of proposed courses of action. *Id*. at 271. The *Majumdar* court concluded that it was irrelevant that the plaintiff's corporation was incorporated "with unrestricted powers to practice medicine" because those powers did not necessarily mean that the corporations would be in direct competition and the conflict of interest created by the plaintiff's direct competition existed even if the plaintiff's corporation had not been so incorporated. *Id*. at 272.

¶ 70        However, the *Majumdar* court found that the amended complaint alleged that by a *certain date*, the defendants were actually aware of the direct competition between the corporations and still failed to advise the plaintiff to resign as an officer and director of Bel-Austin. *Id*. The amended complaint also alleged the defendants were acting as legal counsel to both corporations by that date. *Id*. The court held that if these allegations were proven, the defendants were "in the position of a conflict of interest," which "could support a finding that the defendants breached their attorney/client relationship with the plaintiffs" that was not barred by the applicable statute of limitations. *Id*. On the basis of this possibility, the appellate court issued a limited remand. *Id*. In the instant case, Terra Nova acquired a broker-dealer license in January 1995, which meant that the defendant attorneys could only have had knowledge of the claimed "direct competition" between BWP and Terra Nova for approximately six months until July 1995, when the attorney-client relationship between BWP and the defendant attorneys terminated, rendering the 2006 suit clearly barred by the two-year statute of limitation. While *Majumdar* favors the defendant attorneys in certain respects, our decision that BWP's legal malpractice suit was untimely does not rest on *Majumdar*.[4]

---

[4]We also note that while the plaintiffs alleged that defendants assisted in the incorporation of Terra Nova "to compete with and take the business of defendants' client, BWP," the record is clear that BWP never registered as a broker-dealer with the SEC, even after its representation by the defendant attorneys ended in July 1995, which means that BWP could not compete directly with Terra Nova for soft dollar revenue under SEC regulations.

¶ 71    In the case at bar, BWP alleged that the defendants breached their duty to the plaintiffs in six ways, with the events underlying each allegation occurring no later than 1995. It is clear on the record before us that the malpractice cause of action based on each claim advanced by BWP accrued long before the instant complaint was filed on September 1, 2006. The circuit court did not err in dismissing BWP's malpractice claims as barred by the statute of limitations as a matter of law based on the undisputed facts of record.

¶ 72                                    Expert Testimony of Frager

¶ 73    Finally, while it is unlikely that the circuit court erred in striking Frager's Rule 213 disclosure submitted in response to the defendants' motion for summary judgment in the form of trial testimony from the Putnam suit and not in the form of an affidavit as required by Illinois Supreme Court Rule 191 (eff. July 1, 2002), and section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2008)), that ruling had no impact on our decision that BWP's malpractice suit was untimely.

¶ 74                                          CONCLUSION

¶ 75    The circuit court did not err in granting summary judgment to the defendant attorneys on Lozman's legal malpractice claims where no attorney-client relationship ever existed between Lozman and the defendant attorneys and no evidence existed in the record that Lozman was an intended third-party beneficiary of the attorney-client relationship that existed between BWP and the defendant attorneys from March 1994 to July 1995. The circuit court properly granted summary judgment to the defendant attorneys on BWP's legal malpractice suit filed in 2006 where the claims accrued contemporaneously with the claims that formed the basis for the 1999 lawsuit the plaintiffs filed against Putnam, which this court ruled was barred under the doctrine of *laches* in *Lozman v. Putnam*, 379 Ill. App. 3d 807 (2008). It necessarily follows from the lack of diligence by the plaintiffs in filing the 1999 suit against Putnam, that their 2006 suit against the defendant attorneys based on the legal assistance they provided Putnam was time barred.

¶ 76    Affirmed.

¶ 77    JUSTICE LAMPKIN, specially concurring.

¶ 78    I concur in the disposition of this case, and with the reasoning of the author of the opinion concerning Lozman's lack of standing to sue defendants for malpractice, the accrual of BWP's malpractice action, and the striking of an expert's testimony. My reservation concerns the analysis of whether a genuine issue of material fact exists concerning when BWP, through Lozman, knew that defendants were involved in the formation of Terra Nova. The author concludes that BWP's obligation to inquire into whether defendants had any involvement in establishing Terra Nova was triggered by (1) Lozman's knowledge by October 1995 that Terra Nova was formed and registered with the SEC as a broker-dealer, and (2) defendants' delivery to Lozman in July 1995 of BWP's corporate documents, which

-20-

indicated that BWP was never registered with the SEC as a broker-dealer. I cannot agree. The best analysis of this issue, in my view, is contained in the circuit court's citation to the record to support its ruling on summary judgment that Lozman, by 1995, knew both that defendants had performed the legal work in the formation of Terra Nova and that Lozman had no ownership interest in Terra Nova.

¶ 79     Lozman's direct testimony at the trial in the Putnam suit in November 2004 established that Lozman knew in 1994 and 1995 that defendants had been working with Putnam to create Terra Nova. Specifically, Lozman testified that the Townsends were concerned about incurring broker-dealer liability if they became shareholders of BWP. (R. Vol. 12, C02846)[5] So, in order to allay the Townsends' fears, Lozman and Putnam decided that BWP would not be an active broker-dealer dealing directly with customers; instead, Terra Nova, a limited liability company, would be formed and it would be an active broker-dealer and deal directly with customers. (R. Vol. 12, C02848-02851) Lozman also testified that although he did not have an attorney to represent him in connection with the issue of BWP and Terra Nova being broker-dealers and his discussions with Putnam, Lozman knew that Putnam's attorney was defendant Mason. (R. Vol. 12, C02851-52) Furthermore, Lozman testified that he asked Putnam in April 1995 for his (Lozman's) ownership certificates in Terra Nova and Putnam told him that "the lawyers were working on that or the lawyers had them." (R. Vol. 12, C02867) Lozman also testified that after he signed the release in October 1995, he consulted with several lawyers about pursuing his wrongful usurpation claims. (R. Vol. 12, C02905-06) Furthermore, Lozman met with a couple of congressmen and their staff and a member from a senator's staff in the Spring of 1998 and contacted the SEC, the National Association of Securities Dealers, and the Commodity Futures Trading Commission in 1997 regarding his perceived claims against Putnam. (R. Vol. 12, C02907-09) Like the circuit court, I believe that Lozman's trial testimony established that he had "extensive contemporaneous knowledge of Terra Nova's formation and defendants' involvement" in it.

¶ 80     In addition to his trial testimony, Lozman's deposition testimony in the instant case, which was taken on multiple days in February and March of 2009, establishes his contemporaneous knowledge of defendants' involvement in the formation of Terra Nova as a broker-dealer. Specifically, Lozman testified that: he and Putnam agreed to create Terra Nova to allay the Townsends' concerns about BWP's liability; Lozman and Putnam were supposed to be 50/50 owners of Terra Nova; Putnam dealt with the attorneys about how to structure Terra Nova; and Lozman knew in late October and early November of 1994 that "Putnam was coordinating the paperwork [to create Terra Nova] through [defendant] Foley & Lardner" even though Lozman did not know exactly who Putnam was working with at Foley & Lardner. (R. Vol. 4, C00752-52(b) and C00764) Furthermore, when defendants' counsel asked Lozman how defendants should have known that Lozman was supposed to have an ownership interest in Terra Nova, Lozman explained that he used to sit right next to Putnam and thus overheard Putnam's telephone conversations with somebody at Foley &

---

[5]Citations to the appellate record are designated as R. Vol. __, C__. For double-sided pages, the unstamped back page is designated R. Vol. __, C__(b).

Lardner about creating Terra Nova and the paperwork that Foley & Lardner had prepared. (R. Vol. 4, C00754) Lozman also testified that he overheard Putnam's telephone discussions with Foley & Lardner about Lozman's and Putnam's concerns that the Townsends would steal their ideas and cut them out of the process. (R. Vol. 4, C00760(b)) When defendants' counsel asked Lozman if his sole source of information about defendants' role in assisting Terra Nova in obtaining SEC registration were the documents produced in discovery in 2000, Lozman responded, "Well, I–I knew they were the corporate lawyers and they were doing all the paperwork. But exactly what papers they filed in January of '95, I don't know." (R. Vol. 4, C00755)

¶ 81    BWP quibbles on appeal that defendant Mason's testimony in 2004 during the Putnam suit was the first explanation Lozman received concerning exactly what work defendants did or did not do for both BWP and Terra Nova. This quibble, however, fails to create a genuine issue of material fact sufficient to withstand defendants' motion for summary judgment. The record establishes that Lozman knew in 1994 and 1995 that defendants were involved in the formation of Terra Nova. Moreover, when Lozman signed the release in October 1995, he knowingly and voluntarily gave up any interest he may have had in Terra Nova. Because Lozman knew about defendants' contemporaneous involvement in the formation of Terra Nova, the two-year time limit for BWP to bring its breach of fiduciary claims against defendants began to run from October 1995.

¶ 82    For the reasons above, I believe that BWP's claims are time-barred.

¶ 83    I concur in the rest of the opinion.


¶ 84    PRESIDING JUSTICE GORDON, dissenting in part.

¶ 85    I believe that summary judgment was inappropriate in this case because questions of fact exist concerning the accrual of BWP's cause of action for legal malpractice. In a legal malpractice case, the statute of limitations does not start until the client is aware of his damages. As I will explain in this dissent, in order to determine under the facts of this case when the client was aware of its damages, certain credibility determinations have to be made, and credibility determinations have no place in deciding motions for summary judgment. Therefore, I must respectfully dissent from the majority's conclusion that BWP's suit is barred by the statute of limitations.

¶ 86    I disagree with the majority's contention that "[i]t necessarily follows from our conclusion in *Lozman* that the plaintiffs lacked diligence in filing suit against Putnam (and others) in 1999, that BWP's suit filed in 2006 against the Putnam attorneys for conduct that occurred contemporaneously with Putnam's conduct as alleged in the Putnam suit, was barred by the two-year statute of limitations for professional negligence before the date of the first tolling agreement of September 6, 2000." *Supra* ¶ 47. As I will explain, the suit against Putnam and the suit against defendants are distinct causes of action. The fact that plaintiffs lacked diligence in bringing suit against Putnam does *not* necessarily compel the conclusion that BWP knew or should have known that it also had a cause of action against defendants. Instead, questions of fact preclude the entry of summary judgment in this case based on that conclusion also.

¶ 87 Although not discussed by the majority, I believe that the procedural posture of the case at bar is dispositive. The instant appeal arises from the trial court's grant of defendants' motion for summary judgment "on the statute of limitations issue solely." A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 88 "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 89 " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952).

¶ 90 In the case at bar, there are several questions of fact concerning the accrual of BWP's cause of action for legal malpractice against defendants. Accordingly, summary judgment was inappropriate.

¶ 91                                                    I. Injury

¶ 92 First, I believe that BWP has established a question of fact concerning the accrual date of the cause of action based on the date of its discovery of its injury. As noted, "a cause of action for legal malpractice does not accrue until a plaintiff discovers, or within a reasonable time should discover, his injury and incurs damages directly attributable to counsel's neglect." *Lucey*, 301 Ill. App. 3d at 353. To determine when BWP discovered its injury, it is necessary to determine what BWP's injury was. Defendants, and the majority, focus on plaintiffs' discovery of the operation of Terra Nova as a broker-dealer business, which the trial court and jury in the Putnam suit determined occurred no later than October 1995. However, the "injury" in the case at bar is the loss to BWP caused by defendants'

-23-

participation in setting up Terra Nova as a competitor to BWP and their failure to disclose that participation. In other words, the "injury" does not occur from Putnam's breach itself, but from defendants' participation in Putnam's breach when BWP was aware of its actual damages. Thus, the question is not when BWP knew of Putnam's breach, but when it knew of *defendants' participation* in wrongfully setting up Terra Nova and its later consequences in causing damages to BWP.

¶ 93    The record reveals that there is a question of fact as to when plaintiffs were aware of defendants' wrongful conduct. For instance, during his deposition for the instant case, Lozman testified that he first discovered that Putnam had conversations with defendants about BWP's broker-dealer status when discovery began in the Putnam suit in 2000. Additionally, Lozman testified that the first time he heard defendants explain what they had done concerning BWP and Terra Nova was when Mason testified during the Putnam suit in 2004. The trial court also noted in its order that "Blue Water Partners categorically stated throughout its submissions, and in open court during the hearings, that Fane Lozman never knew what the defendants did, or did not do, with respect to the work that they performed for both Blue Water Partners and Terra Nova Trading."

¶ 94    The majority states that "it is beyond dispute that as of October 1995, Lozman knew both that Terra Nova came into existence as a corporate entity and that Terra Nova was registered with the SEC as a broker-dealer, a fact unequivocally established by the April 17, 1995 agreement Lozman and Putnam signed that routed soft money revenue earned by ScanShift at BWP through Terra Nova. It also cannot be disputed that upon the transfer of BWP corporate documents to Lozman by defendant Mason, Lozman had the information to confirm that BWP was never registered with the SEC as a broker-dealer, which Lozman faults the defendant attorneys for not completing, an obligation that could not have been fulfilled after July 1995, when the defendant attorneys were discharged by BWP." *Supra* ¶ 52. As a result, the majority finds that "[t]hese two undisputed facts, if not constituting actual knowledge that Mason was involved as the circuit court found, were sufficient to trigger an obligation by BWP to inquire whether Mason or anyone else at Foley & Lardner had any involvement in establishing Terra Nova." *Supra* ¶ 53. I disagree with the majority's conclusion, and also find the majority's reliance on *SK Partners*, 408 Ill. App. 3d at 130, to be inapplicable.

¶ 95    In *SK Partners*, an accounting malpractice case involved an overpayment in taxes due to the malpractice. The plaintiffs argued that the statute of limitations should have begun to run when they had actual knowledge of the malpractice, namely, when the IRS accepted their amended tax return and issued a refund check. *SK Partners*, 408 Ill. App. 3d at 130. However, we noted that actual knowledge was not necessary and that the proper question was "determining when the tax overpayment was sufficiently discovered such that plaintiffs had a 'reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue.' " *SK Partners*, 408 Ill. App. 3d at 132 (quoting *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673 (1997)). We concluded that the plaintiffs had sufficient knowledge of the tax overpayment when their new accountant told them that there seemed to be inconsistencies in their tax returns or, at the latest, when he filed the amended return. *SK Partners*, 408 Ill. App. 3d at

-24-

132-33.

¶ 96　In the case at bar, however, there was no "new attorney" who examined defendants' conduct and informed BWP that defendants had likely been negligent, as in *SK Partners*. According to Lozman, it was only during discovery in the Putnam suit that he, and by extension, BWP, discovered defendants' negligence. Lozman is not an attorney and "[g]iven the attorney's duty to act skillfully and diligently on the client's behalf, the client is presumed unable to discern any misapplication of legal expertise." *Trogi v. Diabri & Vicari, P.C.*, 362 Ill. App. 3d 93, 98 (2005). I do not believe that the fact that Lozman may have been aware that defendants had some involvement in the formation of Terra Nova necessarily compels the conclusion that Lozman was aware that defendants were wrongfully setting up Terra Nova to be a competitor of BWP and that BWP would be substantially damaged as a result.

¶ 97　The majority also quotes the language in *SK Partners* that the statute of limitations began to run when the plaintiffs "had a 'reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue' " (*SK Partners*, 408 Ill. App. 3d at 132 (quoting *Dancor*, 288 Ill. App. 3d at 673)), and concludes that, "[u]nder the facts of this case, there can be little dispute that BWP, through Lozman, acted on its obligation to inquire further on possible wrongful conduct following the demise of the BWP venture with Putnam in 1995, when, as Lozman testified at his deposition, he consulted with an attorney about potential claims against Putnam and those acting on Putnam's behalf, which consultation apparently gave rise to the Putnam suit, albeit the plaintiffs lacked diligence in filing suit in 1999" (*supra* ¶ 51 (citing *Lozman*, 379 Ill. App. 3d at 821)). However, while he consulted with an attorney about BWP's potential claims against Putnam and the related entities, there is no indication that Lozman was or should have been inquiring into the actions of defendants as well. Again, the injury in the case at bar was from *defendant's participation* in Putnam's conduct, not merely from Putnam's conduct itself. The question of whether Lozman should have been investigating the defendants as well as Putnam at that time is a question of fact, which is another reason why summary judgment was inappropriate.

¶ 98　It is worth emphasizing that "[t]he purpose of summary judgment is not to try a question of fact but simply to determine if one exists." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). In the case at bar, since the facts could support more than one conclusion, I cannot agree that the injury occurred prior to 1998. See *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 251 (1994) ("Since the facts could support more than one conclusion, it was error to enter summary judgment."). Furthermore, the question of when BWP was or should have been aware of its injury is a question of fact that involves determining the credibility of witnesses, which is inappropriate to do on summary judgment. See *Jackson Jordan*, 158 Ill. 2d at 250 ("The time at which a party has or should have the requisite knowledge under the discovery rule to maintain a cause of action is ordinarily a question of fact." (citing *County of Du Page v. Graham, Anderson, Probst & White, Inc.*, 109 Ill. 2d 143, 154 (1985))); *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, ¶ 25 (noting that a trial court cannot make credibility determinations or weigh the evidence at the summary judgment stage (citing *Pietruszynski v. McClier Corp., Architects & Engineers, Inc.*, 338 Ill. App. 3d 58, 67-68 (2003))). Finally, at this point in the

proceedings, " 'the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). Here, BWP has done so and accordingly, I would reverse the grant of summary judgment in defendants' favor.

¶ 99                                      II. Damages

¶ 100    In addition to the questions of fact concerning plaintiffs' discovery of their injury, I would find questions of fact concerning when damages were incurred. BWP argues that it was damaged by defendants' alleged negligence at the time that judgment was entered against them in the Putnam suit. In support of this claim, BWP relies on *Lucey* and its explanation of what it terms the "adverse judgment accrual rule," which is explained thoroughly by the majority. See *supra* ¶¶ 54-58, 62-64 (explaining *Lucey*, *Warnock*, and *Learning Curve*).

¶ 101    In *Lucey*, the appellate court explained that damages were required for a malpractice action to accrue and "[w]here the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists." *Lucey*, 301 Ill. App. 3d at 353. The court noted that while the defendant law firm may have breached its duty when it gave the plaintiff allegedly negligent advice, the cause of action for legal malpractice did not accrue "until [the] plaintiff discovers, or within a reasonable time should discover, his injury and incurs damages directly attributable to counsel's neglect." *Lucey*, 301 Ill. App. 3d at 353. The court concluded that "[s]ince it is also possible the former client will prevail when sued by a third party, damages are entirely speculative until a judgment is entered against the former client or he is forced to settle. When uncertainty exists as to the very fact of damages, as opposed to the amount of damages, damages are speculative [citation], and no cause of action for malpractice can be said to exist." *Lucey*, 301 Ill. App. 3d at 355.

¶ 102    The court then set forth what plaintiffs here refer to as the "adverse judgment accrual rule," noting that "a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Lucey*, 301 Ill. App. 3d at 356. The court pointed to policy reasons that opposed a rule that would require a client to file a provisional malpractice action whenever an attorney's legal advice had been challenged, including judicial economy and the preservation of the attorney-client relationship. *Lucey*, 301 Ill. App. 3d at 357. It then found that the trial court was correct in dismissing the complaint as premature, as "[t]his is not a case where it is plainly obvious, prior to any adverse ruling against the plaintiff, that he has been injured as the result of professional negligence," since it could not be said that the plaintiff as a layman knew or reasonably should have known that the legal advice was erroneous when he was sued by his employer.[6] *Lucey*, 301 Ill. App. 3d at 358-59. The court concluded that damages would not

---

[6]The court later determined that while the complaint was properly dismissed, it should not have been dismissed with prejudice since the plaintiff should be permitted to refile his complaint

be actionable until the other litigation was decided adversely to him. *Lucey*, 301 Ill. App. 3d at 359.

¶ 103    In the case at bar, BWP claims that the cause of action accrued no earlier than the date of the judgment in the Putnam suit because the Putnam suit was a "case in which plaintiffs were litigating against Putnam to obtain their legal rights because of defendants' negligent representation in the corporate transactions mishandled by plaintiffs' corporate lawyers." Defendants, on the other hand, claim that the adverse judgment accrual rule does not apply because "the Putnam Litigation had no effect on the accrual of BWP's claims against these Defendants." There exists a question of fact concerning whether the date of the judgment was the date that BWP incurred damages and consequently, when its cause of action against defendants accrued.

¶ 104    Unlike the majority, I would find that "uncertainty exists as to the very fact of damages" in the case at bar. *Lucey*, 301 Ill. App. 3d at 355. The majority contends that "[u]nlike *Lucey*, *Warnock*, and *Learning Curve*, where a judgment against the former client in the underlying suit would confirm legal malpractice by giving rise to actual damages directly attributable to the negligent advice of counsel, the judgment in the Putnam suit did nothing to confirm the *existence* of damages allegedly suffered by BWP." (Emphasis in original.) *Supra* ¶ 65. However, in BWP's case, while Putnam prevailed, the jury made a finding that Putnam had usurped BWP's corporate opportunities. According to BWP, it was not until the jury in the Putnam case found that Putnam and Terra Nova engaged in wrongful conduct that BWP was damaged by defendants' conduct. Thus, the resolution of the Putnam suit would have confirmed the existence of damages. Additionally, as the majority acknowledges, "had the jury in the Putnam suit found no breach of duty by Putnam in establishing Terra Nova, BWP could prove no breach of duty against the defendant attorneys." *Supra* ¶ 67. Again, the question of when BWP was damaged is a question of fact that involves determining the credibility of witnesses, which is inappropriate to do on summary judgment. See *Gulino*, 2012 IL App (1st) 102429, ¶ 25 (noting that a trial court cannot make credibility determinations or weigh the evidence at the summary judgment stage (citing *Pietruszynski*, 338 Ill. App. 3d at 67-68)). Since "[t]he purpose of summary judgment is not to try a question of fact but simply to determine if one exists" (*Forsythe*, 224 Ill. 2d at 280), I would find the questions of fact preclude entry of summary judgment on this basis. Accordingly, I must respectfully dissent from the majority's conclusion that BWP's suit is barred by the statute of limitations.

---

once the litigation against his employer was resolved. *Lucey*, 301 Ill. App. 3d at 359-60.

-27-